In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-3732 & 13-3738

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

ALL FUNDS ON DEPOSIT WITH R.J. O'BRIEN &
ASSOCIATES, HELD IN THE NAME OF BRIDGE
INVESTMENT, S.L., BEARING ACCOUNT NUMBERS
XXX-X3931 AND XXX-X1784, MAINTAINED AT
HARRIS BANK, ACCOUNT NUMBER XXX-171-6,

*Defendant,*

ONE BEACON INS. CO., *et al.,*

*Claimants-Appellees.*

———————————————

ART INSURANCE CO., *et al.,*

*Plaintiffs-Appellees,*

*v.*

AL QAEDA

*Defendant.*

APPEAL OF: UNITED STATES OF AMERICA

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:11-cv-04175 & 1:12-cv-01346 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 11, 2014 — DECIDED APRIL 2, 2015

Before BAUER, MANION, and KANNE *Circuit Judges.*

KANNE, *Circuit Judge.* Heinous acts of terror breached the shores of the Nation on September 11, 2001. Approximately 3,000 innocents lost their lives, affecting countless other persons, communities, and businesses. In the aftermath of that tragic day, Congress sought to provide victims with a workable means to recover their losses. So it passed the Terrorism Risk Insurance Act ("TRIA") of 2002, a sweeping statute that authorizes execution on blocked assets that are seized or frozen by the United States, in satisfaction of judgments against terrorists.

That statute is the focus of this dispute. Were this Court bound by TRIA's noble purpose alone, our judgment, no doubt, would be favorable to Appellees. They are victims of terror, after all, and they hold a judgment against al Qaeda for their $2.5 billion subrogation claims. But a statute's purpose, no matter how noble or just, cannot defy the unambiguous and plain meaning of its text.

TRIA's text, on at least two key points, is quite plain: (1) the only assets subject to execution are blocked assets; and (2) assets that are subject to a United States Government ("USG") license for final payment, transfer, or disposition,

among other requirements, do not qualify as blocked assets. Because the defendant funds here are subject to such a license and have been arrested for civil forfeiture, they do not qualify as blocked assets under TRIA. Appellees' claims under TRIA therefore must fail. Although we find Appellees possess both constitutional and statutory standing, we nevertheless vacate the district court's grant of summary judgment in favor of Appellees. Appellees cannot prevail on the merits under TRIA.

## I. BACKGROUND

Muhammad Abdallah Abdan Al Ghamdi, also known as Abu al Tayyeb ("al Tayyeb"), provided financial and military support for al Qaeda. Specifically, he raised money for al Qaeda's operations and managed its supply chain in Kandahar, Afghanistan. His criminal network included, among others, Osama Bin Laden, Khalid Sheik Mohammed, and three individuals who participated in the September 11 attacks.

Beginning in 2003 and continuing through 2005, al Tayyeb invested a large sum of cash with R.J. O'Brien & Associates ("RJO"), a financial firm in Chicago. Under the name "Bridge Investments," and with the assistance of Mohammad Qasim al Ghamdi (who served as general manager of the account), al Tayyeb invested over $26,000,000 in futures trading accounts with RJO. Notably, al Qaeda had a beneficial interest in these accounts.

In less than a year, though, the accounts lost nearly eighty-percent of their value. They dwindled to just over $6,000,000.

For al Tayyeb, matters only got worse. Saudi Arabian authorities arrested him in June 2006, thwarting his plans to attack Saudi Arabia and the United States. Then, on June 18, 2006, the U.S. Department of the Treasury ("DOT"), Office of Foreign Assets Control ("OFAC"), blocked his RJO investments—then totaling $6,226,355—pending investigation. In procuring the block, OFAC exercised its authority under Executive Order 13224 of September 23, 2001, the International Emergency Economic Powers Act, Title 50, United States Code, Section 1701 *et seq.*, and the Global Terrorism Sanctions Regulations, 31 Code of Federal Regulations, Part 594.

On June 19, 2011, while the funds were still blocked, the United States filed a verified complaint in the Northern District of Illinois seeking forfeiture of the funds under 18 U.S.C. § 981(a)(1)(G)(I), (iv).[1] That complaint was the catalyst for this dispute. It revealed the existence of al Tayyeb's blocked funds, which, until that time, had been designated as classified by the United States. The press soon caught wind; one newspaper ran a story on the defendant funds within three days. *See* Annie Sweeney, *Al-Qaida figure invested with Chicago firm*, Chicago Tribune, June 22, 2011, at 1:5. Claimants-Appellees ("Appellees") took notice.

Appellees are comprised of groups of insurance companies that paid more than $2.5 billion in property-damage and

---

[1] This statute renders "all assets, foreign or domestic … of any individual, entity, or organization engaged in planning or perpetrating" acts of terrorism either against the United States and its citizens or against foreign governments subject to civil forfeiture. 18 U.S.C. § 981 (a)(1)(G)(I), (iv). Section 983 of Title 18 provides the "[g]eneral rules for civil forfeiture proceedings[,]" a relevant section that we address below.

business-interruption claims following the September 11 attacks. After learning of al Qaeda's ties to the defendant funds, Appellees filed their own verified claims to the funds. They cited as their interest a "default judgment as to liability" award issued in their favor (and against al Qaeda) by the Southern District of New York.

Some further background is necessary. Appellees, along with several thousand personal-injury plaintiffs who form a party to the *In re Terrorist Attacks Upon the United States* multi-district litigation, initially filed tort claims against al Qaeda for the September 11 attacks in the Southern District of New York. That litigation lingered for some time as, unsurprisingly, al Qaeda did not enter an appearance or try to contest the claims. Eventually, on April 7, 2006, the Southern District of New York entered a default judgment as to liability against al Qaeda, holding it liable for the September 11 attacks. It was this order that Appellees cited as giving them an interest in the defendant funds.

In any event, after Appellees filed their verified claims contesting forfeiture in the Northern District of Illinois, the personal injury plaintiffs got involved. They moved to intervene in the forfeiture action under Rule 24 of the Federal Rules of Civil Procedure.

With the filing of all these claims, two related cases were born: the original forfeiture action in which the United States sought forfeiture of al Tayyeb's assets (i.e., the defendant funds) and the later enforcement action in which Appellees sought to execute their judgment against those same funds. Both cases are before us on appeal. We return to the topic of Appellees' verified claims.

Appellees' initial claimed interest in the defendant funds rested on tenuous ground. For although the Southern District of New York held al Qaeda liable for Appellees' damages, its April 7, 2006, order did not say for how much. In short, the New York judgment was incomplete. That fact did not change until January 25, 2012, when the Clerk of Court for the Southern District of New York entered final judgment in the amount of $9,351,247,959.99. We note that the death of the original MDL judge played a significant role in the delay of entering final judgment, a fact that is relevant to our later discussion concerning Appellees' motion for leave to amend.

After Appellees filed their verified claims in the Northern District of Illinois but before they registered their final judgment against al Qaeda in the Southern District of New York, the United States moved to strike their claims and answers in the Northern District of Illinois. In its view, Appellees lacked the requisite ownership and legal interest in the defendant funds to participate in the forfeiture proceedings because their judgment against al Qaeda was not final and because they secured no lien against the defendant funds.

The Northern District of Illinois initially agreed. It held that Appellees failed to satisfy their pleading obligations under both Rule G(5)(a)(i)(B) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and the related civil forfeiture statute, 18 U.S.C. § 983(a)(2)(C)(ii). Labeling Appellees "general unsecured creditor[s]," the district court found that they could not establish their interest in the property to be forfeited. *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, No. 11 C 4175, 2012 U.S. Dist. LEXIS 41309, at *17 (N.D. Ill. Mar.

27, 2012) ("*R.J. O'Brien I*"). As a result, Appellees lacked statutory and prudential standing.[2]

After making those key findings, the Northern District of Illinois (1) granted the motion to strike and (2) denied the personal injury claimants' motion to intervene. It also denied Appellees' motion for leave to amend their complaint, reasoning that because Appellees had not yet secured a lien against the defendant funds, any amendment could not cure the statutory standing defect. In a significant footnote, however, the district court offered a life raft to Appellees:

> The [c]ourt need not consider whether they legally can serve a citation at this time or, if so, whether it would be appropriate then to allow the insurance claimants to amend their claims. Similarly, the [c]ourt need not consider the effects of [the] Terrorism Risk Insurance Act of 2002 … on the claimants' ability to execute their judgments against the property at issue.

*R.J. O'Brien I*, 2012 U.S. Dist. LEXIS 41309, at *23 n.1.

Accepting the life raft, Appellees quickly served on the U.S. Marshals Service a citation to discover assets. The United States moved to quash. The district court denied the motion to quash and issued a writ of execution. Recognizing Appellees' changed circumstances (namely, their lien), the court found Appellees possessed statutory and prudential standing. It also found that any procedural hurdles to standing—imposed by the civil forfeiture statute, *see* 18 U.S.C. § 983—

---

[2] The district court did not address the issue of constitutional standing at the time it rendered this decision.

were superseded by TRIA's "[n]otwithstanding any other provision of law" ("notwithstanding") clause. *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038, 1050–53 (N.D. Ill. 2012) ("*R.J. O'Brien II*"). The district court then permitted Appellees to amend their claims to reflect their perfected lien on the defendant funds.[3] *Id.* at 1053. And the litigation marched forward.

The United States moved to certify the district court's decision for interlocutory appeal. It lost. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, Nos. 11 C 4175 & 12 C 1346, 2012 U.S. Dist. LEXIS 189345, at *11 (N.D. Ill. Dec. 12, 2012) ("*R.J. O'Brien III*"). The parties then filed cross motions for summary judgment. In its motion, the United States renewed its standing arguments.[4]

Appellees, for their part, relied on TRIA. In their view, that statute prioritizes their interest in the defendant funds, even in the face of a government forfeiture action. Additionally, Appellees argued that the "notwithstanding" clause supersedes the procedural oddities of civil forfeiture law. Invoking the purpose and intent of TRIA, Appellees finally argued that the defendant funds should be subject to execution to satisfy their judgment against al Qaeda. The district

---

[3] This time, the district court addressed the issue of constitutional standing; it held they had it. *R.J. O'Brien II*, 892 F. Supp. 2d at 1049.

[4] The United States also argued Appellees could not execute their judgment against the defendant funds because TRIA did not waive the sovereign immunity of the United States, an argument it raises again on appeal. For reasons discussed below, we need not address this precise issue here.

court agreed with Appellees' interpretation of TRIA. It granted summary judgment in their favor.

Importantly, the district court did so based on the critical assumption that the defendant funds remained blocked at the time the parties moved for summary judgment. "[I]t is undisputed," the district court noted, "that the assets in question are 'blocked,' a status that is *essential* for a TRIA claim to go forward; the government labeled the assets as such in its complaint." *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 982 F. Supp. 2d 830, 844 (N.D. Ill. 2013) ("*R.J. O'Brien IV*") (emphasis added).

But six months before the Southern District of New York had entered final judgment in Appellees' favor, and more than two years before the Northern District of Illinois issued its decision in favor of Appellees, OFAC granted a license to the Department of Justice ("DOJ") on July 8, 2011. That license permitted the DOJ to "take all necessary actions in furtherance of the … pursuit of [the] civil forfeiture of the [defendant funds]." Gov't App'x L.A. 272, ¶ 20. Four days after OFAC granted the license, the Northern District of Illinois granted the United States' application for warrants of arrest *in rem* for the defendant funds. The United States executed the warrants on July 12, 2011, and took possession of the funds that same day.

Herein lies the rub. TRIA provides in pertinent part:

Blocked asset.—The term 'blocked asset' means—

(A) *any asset seized or frozen* by the United States under section 5(b) of the Trading With the Enemy Act … or under sections 202 and 203 of the International Emergency Economic Powers Act … and

(B) *does not include property that—*

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Economic Powers Act … or the United Nations Participation Act of 1945 … .

Pub. L. No. 107-297, § 201(d)(2) 116 Stat. 2322, 2339–40 (codified as a note to 28 U.S.C. § 1610) (emphasis added).

The Northern District of Illinois recognized the existence of the license in its decision (it was stipulated by all parties to be an undisputed fact), but it nonetheless treated the funds as if they remained blocked. *See R.J. O'Brien IV*, 982 F. Supp. 2d at 839-40. As we noted before, whether the funds are blocked is the decisive issue. That is because, per TRIA's text, victims of terror may only execute on "blocked" funds. We address this issue in detail below.

Before doing so, however, we address the standing arguments again raised by the United States. These are threshold issues. *Cf. United States v. $304,980.00 in United States Currency*, 732 F.3d 812, 818 (7th Cir. 2013) ("[W]ithout a case or controversy under Article III, we have no authority to proceed to the merits.").

## II. ANALYSIS

### *A. Standing*

Whether constitutional, statutory, or prudential in form, standing is a question of law that we review *de novo. Winkler*

*v. Gates*, 481 F.3d 977, 982 (7th Cir. 2007). We begin our analysis with a discussion of constitutional standing.

*1. Constitutional Standing*

Standing under Article III "is a threshold question in every federal case … ." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "A federal court's jurisdiction can be invoked only … when the plaintiff … has suffered 'some threatened or actual injury resulting from the putatively illegal action[.]'" *Id.* at 499 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 (1943)). Although we have described standing as "undemanding," *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir. 1994), neither intellectual curiosity nor purely psychological harm suffices to establish it. *United States v. 5 S 351 Tuthill Rd, Naperville, Ill.*, 233 F.3d 1017, 1022 (7th Cir. 2000) ("Similarly, simple indignation, or an impact on one's opinions, aspirations or ideology do not suffice to establish standing.") (citations and internal quotations omitted).

Claimants establish constitutional standing in a forfeiture proceeding just as they would in any other proceeding. They must allege (1) an immediate threat of injury that is (2) fairly traceable to the government's conduct, and (3) which a favorable federal court decision likely would redress or remedy. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992)).

Importantly, "a claimant need not 'establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit.'" *$304,980.00 in United States Currency*, 732 F.3d at 818 (quoting *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006)). A claim-

ant need only establish "a colorable *claim* to such a right." *Id.* (emphasis in original). A colorable claim, we emphasize, is merely an arguable one. Underscoring this low bar, we have described it as "one that is not frivolous." *S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund*, 326 F.3d 919, 923 (7th Cir. 2003) (citing *Nuema, Inc. v. AMP, Inc.*, 259 F.3d 864, 878 (7th Cir. 2001)).

Here, Appellees allege an immediate and actual threat of injury that is far from frivolous—the impending forfeiture of seized terrorist funds to which they have an arguable claim. TRIA, the source of that claim, provides in pertinent part:

> Notwithstanding any other provision of law … in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Pub. L. No. 107-297, 201(a), 116 Stat. 2322, 2337 (codified as a note to 28 U.S.C. § 1610).

Appellees fit within this ambit. They are victims of terrorism who hold an unsatisfied judgment against al Qaeda, a terrorist party, in the amount of $9,351,247,959.99. That sum flows from al Qaeda's September 11 attacks, which harmed Appellees by causing them to compensate their insured for massive property-damage and business-interruption claims.

To be sure, the specific defendant funds at issue belonged to al Tayyeb. But he was a key member of al Qaeda, a named terrorist party who both parties agree holds a beneficial interest in the defendant funds.

Collectively, these facts are sufficient to formulate Appellees' arguable claim to the defendant funds. *Cf.* John G. Roberts, Jr., Comment: *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1228 (1993) ("Article III injury may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.") (internal quotations and citations omitted).

The United States disagrees. It argues that Appellees' threat of injury is too speculative to establish constitutional standing. It is wrong. Appellees are akin to the claimant in *5 S 351 Tuthill Rd.* There, a beneficiary of a land trust challenged the government's attempt to forfeit the land that was the subject of the trust. *Id.* at 1021. We found that he possessed standing, as the forfeiture action would have deprived him of proceeds from the future sale of the land. *Id.* at 1024. Even though the value of those land proceeds was unknown—we noted the possibility of a "peppercorn" valuation—the plaintiff could bring his claim because the potential harm was "more than intellectual, psychological or ideological." *Id.* at 1021–22.

So it is here. Appellees secured a default judgment as to liability against al Qaeda before the United States commenced its forfeiture action. That their judgment had not yet been reduced to a monetary sum by the time they filed their verified claims does not render their threat of injury speculative or any less real. Should Appellees not prevail below, their harm, like the harm to the claimant in *5 S 351 Tuthill*

*Rd.*, would be more than intellectual, psychological, or ideological. It would be financial, worth far more than the peppercorn we conjured in *5 S 351 Tuthill Rd.* And although the fraction at stake may be small—$6 million is but a tiny morsel of their billions in damages—the harm is nonetheless concrete.

Turning from the threat of injury (standing factor one) to traceability and availability for redress (standing factors two and three), these funds would redress Appellees' multi-billion-dollar losses sustained in the aftermath of the September 11 attacks. The potential harm derived from the forfeiture of the funds is fairly—and in this case, *directly*—traceable to the United States' conduct, particularly given the United States' verified complaint for forfeiture. And finally, a favorable federal court decision would afford Appellees the long-awaited opportunity to commence satisfaction (however partial) of their judgment against al Qaeda. Each factor having been satisfied, we find Appellees possess constitutional standing. There is a case or controversy before us. U.S. Const. art. III, § 2.

### 2. *Statutory Standing under TRIA*

Even though Appellees possess constitutional standing, we may nevertheless decline to hear this case if Appellees do not "fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984). This is a question of statutory standing, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386–87 (2014), and we address it now.

TRIA plainly contemplates this type of action. Congress passed this statute to provide victims of terror, like Appel-

lees, with a workable means to recover their losses. We need not resort to legislative history to deduce this conclusion; TRIA's preamble states it is designed "[t]o ensure the continued financial capacity of insurers to provide coverage for risks from terrorism." Pub. L. No. 107-297. And that is what Appellees are trying to do—recover their significant financial losses caused by al Qaeda's September 11 attacks. Such recovery would ensure their continued financial capacity, while incentivizing grants of much needed coverage for today's terrorism-related risk. We hold that Appellees are therefore within the zone of interests that TRIA protects.

Our zone-of-interests inquiry ordinarily would be confined to one statute. *See Air Conf. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991) ("[T]he plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interest' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.") (emphasis in original). But this is no ordinary case. Because this appeal involves two actions, both of which implicate rules of forfeiture, we must also determine whether Appellees fall within the zone of interests protected by 18 U.S.C. § 983.

### 3. Statutory Standing under Civil Forfeiture

To establish statutory standing in a civil forfeiture proceeding, a claimant must adhere to the procedural requirements set forth in the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. *See United States v. $487,825 in U.S. Currency*, 484 F.3d 662, 664–65 (3d Cir. 2007). These pleading requirements exist to "force claimants to come forward as quickly as possible after the initiation of forfeiture proceedings, so that the court may

hear all interested parties and resolve the dispute without delay, and to minimize the danger of false claims by requiring claims to be verified or solemnly affirmed." *United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 150 n.9 (3d Cir. 2003) (internal quotation marks and citations omitted).

Here, the procedural requirements at issue are filing deadlines and interest statements concerning the defendant funds. *See generally* Fed. R. Civ. P. Supp. R. G(5). Additionally, the United States argues that Appellees are not innocent owners—an affirmative defense "to the confiscation of assets of suspected international terrorists … ."[5] 18 U.S.C. § 987(a)(2). According to the United States, these deficiencies keep Appellees outside civil forfeiture's zone of interest.

To begin, a claimant has sixty days after the United States commences a forfeiture proceeding to assert an interest in the defendant property, provided the United States published notice of its forfeiture proceeding "on an official internet government forfeiture site." Fed. R. Civ. P. Supp. R. G(a)(ii)(B). If the United States failed to send direct notice to a claimant or his attorney, two additional provisions also allow for a sixty-day filing deadline. Fed. R. Civ. P. Supp. R. G(a)(ii)(C)(1)–(2). Rule G further requires a claimant to state his interest in the property subject to forfeiture. A claimant

---

[5] The district court treated innocent ownership as an issue concerning prudential standing. But in more than one location, the civil forfeiture statute expressly provides for the defense of innocent ownership. *See* 18 U.S.C. §§ 983(d)(1)–(3), 987(a)(2). Accordingly, we discuss it as a matter of statutory standing.

who asserts an interest in the defendant funds must identify the specific property claimed, identify the claimant, and state the claimant's interest in the property. Fed. R. Civ. P. Supp. R. G(a)(i)(A)–(B).

The United States does not quibble with Appellees' original filing date. Appellees filed their initial claims on August 19, 2011, sixty days after the United States commenced its forfeiture action. Instead, the United States takes issue with Appellees' amended verified claims. These claims, it argues, "were more than seven months delinquent." (Appellant's Br. 29.) In making this argument, of course, the United States keeps Appellees' filing clock running, discounting entirely the filing of their original verified claims and the district court's order permitting Appellees to amend those claims.

We do not accept this tally of time. The district court acted within its discretion when it allowed Appellees to amend their claims. *See United States v. U.S. Currency, in the amount of $103,387.27*, 863 F.2d 555, 563 (7th Cir. 1988). Having been granted a motion to amend their verified claims, Appellees did not offend the filing deadlines.

As for Appellees' stated claims of interest, it is undisputed that Appellees missed the mark when they initially filed their claims. The district court correctly noted that, without either a final judgment entered or lien secured, Appellees were nothing more than "general unsecured creditors" when they first filed their claims. But once again, the district court acted within its discretion when it allowed Appellees to amend their claims.

As to this point, we remind the United States that the Federal Rules of Civil Procedure are always in play, even in

the midst of civil forfeiture actions. *See $8,221,877.16 in United States Currency*, 330 F.3d at 149 ("Parties to civil forfeiture proceedings are the servants of two procedural masters: the Supplemental Rules devised for … *in rem* proceedings, and the generally applicable Federal Rules of Civil Procedure."). Rule 15 expressly provides that a "court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(1)(2).

We find that justice required that the court grant Appellees leave to amend. By keeping the defendant funds classified, and therefore secret, until the moment it commenced its forfeiture action, the United States made it nearly impossible for Appellees to satisfy their pleading requirements under Rule G. Appellees had little if any time to secure a lien and perfect their interest by the time the funds were made public. Worse, the original MDL judge died, greatly lengthening the time it took for the Southern District of New York to enter final judgment in favor of Appellees (and against al Qaeda). Understanding these unusual facts, and recognizing the flattening effect of TRIA's "notwithstanding" clause (discussed below), the district court properly exercised its discretion and permitted Appellees to amend their claims. As a result, this procedural requirement, like the filing deadline requirement, poses no bar to Appellees' statutory standing under civil forfeiture.

That leaves us with innocent ownership. Innocent ownership is a defense to civil forfeiture. 18 U.S.C. § 983(d)(1); *see also United States v. Bakjakajian*, 524 U.S. 321, 332 (1998) (noting "forfeiture … cannot be imposed upon innocent owners."). It prevents civil forfeiture so long as a claimant can prove by a preponderance of the evidence that "he did not

know about or consent to the illegal use" of the property subject to forfeiture. *5 S Tuthill Rd.*, 233 F.3d at 1026; *see also* 18 U.S.C. § 983(d)(1), (2)(A)(ii) (noting the defense is also triggered when, "upon learning of the conduct … [the claimant] did all that reasonably could be expected under the circumstances to terminate such use of the property"). In the terrorism-forfeiture context, "[a]n owner of property that is confiscated under any provision of law … may … assert[] as an affirmative defense that the innocent owner provisions of section 983(d) of title 18, United States Code, apply to the case." 18 U.S.C. § 987(a)(2).

The United States argues that Appellees cannot satisfy this requirement. As a result, the argument goes, Appellees fall outside the zone of interests protected by civil forfeiture and do not satisfy statutory standing.

We have observed that "a rather expansive zone of interests is protected by the innocent ownership provision" of forfeiture law. *5 S 351 Tuthill Rd.*, 233 F.3d at 1023 (quoting *United States v. U.S. Currency, $81,000*, 189 F.3d 28, 34 (1st Cir. 1999)). The problem for Appellees is that, despite this expansive zone, innocent ownership only applies to two types of claimants: (1) those who enjoyed an ownership interest in the property at the time of the event triggering forfeiture; and (2) those who acquired an ownership interest in the property after the triggering event as bona fide purchasers or sellers for value ("BFPV") without knowledge that the funds were subject to forfeiture. *See* 18 U.S.C. §§ 983(d)(2)(A), (3)(A). Neither of those applies here.

Regarding the first definition, al Tayyeb deposited his funds beginning in 2003 and continuing through 2005. Assuming for the sake of argument that Appellees' default

judgment as to liability against al Qaeda was sufficient for them to acquire an ownership interest in the defendant funds, the Southern District of New York did not issue that order until April 7, 2006, a date that comes well after al Tayyeb's deposits with RJO ceased.

That means qualifying as BFPVs is the only way for Appellees to satisfy the affirmative-defense requirement and enter the zone of interests protected by the statute. Appellees, however, cannot do that. Although Appellees acquired their interest in the defendant funds after the acts giving rise to the forfeiture occurred, they did not purchase or sell anything. They simply seek to recover their losses, an impossible goal under this statutory regime. The civil forfeiture statute does not contemplate that kind of relief. Without some mechanism that enables Appellees to overcome this final obstacle, Appellees would be unable to participate in the forfeiture proceeding.

### i. The Mechanism - TRIA

Innocent ownership brings us, at long last, to TRIA. We find TRIA's broad "notwithstanding" clause supersedes the innocent ownership requirement of civil forfeiture. Put differently, it cures Appellees' standing defect under civil forfeiture law. Several reasons compel our conclusion. First and foremost, once the United States commences a forfeiture action, it is impossible for qualified albeit unrelated victims of terror (here, the insurance companies) to comply with civil forfeiture's innocent owner requirement *and*, at the same time, execute against the blocked funds. This conflict requires the innocent owner provision to yield in the face of TRIA's broad "notwithstanding" clause. A clause, we emphasize, that expressly permits Appellees or any person who

"has obtained a judgment against a terrorist party on a claim based upon an act of terrorism," to execute on, or attach in aid of execution on, the blocked funds of the terrorist party to satisfy their judgment, "[n]otwithstanding *any other provision of law*[.]" Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2377 (emphasis added).

We have recognized the potent power of a "notwithstanding" clause before. *See Joren v. Napolitano*, 633 F.3d 1144, 1146 (7th Cir. 2010) ("[T]he use of a "notwithstanding" clause signals Congressional intent to supercede conflicting provisions *in any other statute*.") (citing *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)) (emphasis added). Where a "notwithstanding" clause is cabined by terms limiting its scope, we have recognized those limits as well. *See Citizens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016, 1019 (7th Cir. 1995) (finding the "notwithstanding" clause of CERCLA, 42 U.S.C. § 9607(a), refers only to substantive liability and therefore has limited applicability) (citations omitted). In TRIA, there are no terms that limit this clause's scope.

To the contrary, words of broad application bookend TRIA's "notwithstanding" clause. The statute reads in pertinent part: *"In general.*—Notwithstanding any other provision of law … *in every case* in which a person has obtained a judgment … ." Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2377 (emphasis added). The only textual limitation to this broad power is found in subsection (b), which provides for discretionary presidential waivers, on an asset-by-asset basis, when the property is "subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Con-

sular Relations." *Id*. But neither party contends that subsection applies here.

For all these reasons, the district court correctly relied on TRIA in finding that Appellees could proceed with their claims notwithstanding the conflicting provisions of civil forfeiture. Forfeiture's standing requirements cannot overcome TRIA's sweeping mechanism for recovery. In so holding, we pass no judgment on the merits of Appellees' claims under TRIA.[6] For that substantive issue is discussed below. At this point, we simply open the doors for Appellees to enter the courthouse.

Fighting this conclusion, the United States asks us to adopt what it views as persuasive precedent from the Fifth Circuit. *See generally United States v. Holy Land Found. for Relief and Dev.*, 722 F.3d 677 (5th Cir. 2013) ("*Holy Land*"). While that case is instructive, particularly on the status of restrained funds subject to an OFAC license, we are unconvinced that the Fifth Circuit reads the "notwithstanding" clause more narrowly than we do.

In *Holy Land*, the court held TRIA's "notwithstanding" clause "does not trump" provisions of the *criminal* forfeiture statute, 21 U.S.C. § 853, a statute similar to its civil counterpart. *Id.* at 687. But the Fifth Circuit rendered this holding in response to arguments that boldly contravened the plain text of TRIA. *Id.* Specifically, the claimants there argued that TRIA superseded provisions within itself, rendering the

---

[6] In particular, we assume at this stage of our analysis that Appellees have a viable (i.e., not frivolous) case that the funds remain blocked and subject to attachment under TRIA.

"blocked assets" requirement of the statute unnecessary. In rejecting this argument, the Fifth Circuit reasoned:

> The presence of the "notwithstanding" clause does not alter our responsibility to abide by the definitions provided by Congress in the same statute. Our role in interpreting the TRIA is to "[g]ive effect to the text congress enacted," not to "rewrite the statute to reflect a meaning we deem more desirable."

*Id.* at 688 (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008)). Appellees make no such argument here. In fact, their argument rests on the assumption that the defendant funds remain blocked—the same assumption adopted by the district court when it granted summary judgment in their favor. Accordingly, we do not find *Holy Land* to be persuasive on the scope of TRIA's "notwithstanding" clause.

Having found that Appellees possess both constitutional and statutory standing, we now proceed to the merits of their case under TRIA. Appellees' claims rise and fall with the text of that statute.

*B. The Status of the Defendant Funds under TRIA*

The "cardinal canon" of statutory interpretation is that we look first to the text of the statute. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says"); *see also* 2A N. Singer, Sutherland Statutory Construction § 46.03, at 82 (4th ed. 1984) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will."). When a statute is unambiguous, our inquiry starts and stops at the text. *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636, 659 (7th Cir. 2014) (en

banc) (Kanne, J., dissenting) ("Absent ambiguity, the first canon [of statutory interpretation] is also the last: 'judicial inquiry is complete.'") (citation omitted).

Here, the relevant text of the statute is unambiguous. For ease of reference, we replicate it once more:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) … the *blocked* assets of that terrorist party (including the *blocked* assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (emphasis added).

By its terms, TRIA allows victims of terror to execute only on *blocked* assets. This point is beyond dispute. *See Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 374 (2009) (observing that TRIA permits "a person with a terrorism-related judgment to attach an asset … *provided the asset was a "blocked asset"*") (emphasis added); *Estate of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011) ("The TRIA … applies only to blocked assets").

Relevantly then, TRIA defines blocked assets as:

(A) any asset *seized or frozen by the United States* under section 5(b) of the Trading With the Enemy Act … or under sections 202 and 203 of the International Emergency Economic Powers Act … and

(B) *does not include property that—*

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Economic Powers Act … or the United Nations Participation Act of 1945 … .

Pub. L. No. 107-297, § 201(d)(2), 116 Stat. 2322, 2339–40 (emphasis added). It is this section that engenders strong dispute between the parties.

According to Appellees, despite the fact that OFAC issued a license to the DOJ to "take all necessary actions in furtherance of the … pursuit of [the] civil forfeiture of the [defendant funds]," the defendant funds remain blocked within the meaning of TRIA. That the funds have also been arrested does nothing to change this status, they argue. Their first argument in support of this conclusion rests, in part, on the verified complaint filed by the United States. There, the United States admitted that OFAC blocked the defendant funds on June 18, 2006. Secondarily, Appellees rely on the fact that the district court treated the defendant funds as blocked in its opinion below.

To the extent that this argument sounds in law-of-the-case doctrine, we reject it. That the United States or the dis-

trict court, at one point or another, found the funds to be blocked does not render them blocked now. *Holy Land*, 722 F.3d at 688 ("The fact that the government and the parties treated and considered the assets as blocked throughout the criminal trial does not make them so.") (internal citations and quotations omitted). TRIA, moreover, "does not guarantee that any blocked assets will in fact be available when a particular victim seeks to execute on a judgment." *Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003). Because the law of the case doctrine is discretionary, *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 381 (7th Cir. 1992), and "is not designed to perpetuate error," *id.*, we will not consider the funds blocked if they are not in fact blocked.

Appellees next argue that because the OFAC license itself was not attached to the record, it cannot form a basis for reversal. In support, Appellees rely on *United States v. Alcantar*, 83 F.3d 185, 190–91 (7th Cir. 1996), wherein we denied a motion to supplement the record with new evidence on appeal. *Id.*

But Appellees' reliance on *Alcantar* is misplaced. *Alcantar* is a criminal case that addressed alleged errors at trial such as sufficiency of the evidence and ineffective assistance of counsel ("IAC"). *Id.* at 189–91. Attempting to preserve his claim of IAC, the appellant there moved to supplement the appellate record with transcripts from his grand jury proceeding. *Id.* at 190. We denied the appellant's motion, reasoning that because those materials were never before the district court, we could not consider them on direct appeal. *Id.* (citing Fed. R. App. 10(e)) (additional citations omitted). We subsequently encouraged the appellant to include the

matters in his collateral proceeding. *Id.* at 191. Those facts are far removed from the case at bar.

In characterizing the OFAC license as new evidence, Appellees look past the Stipulation of Undisputed Facts. There, Appellees stipulated that OFAC issued a license concerning the defendant funds. Appellees also stipulated to the broad terms of this license, which expressly authorized the DOJ to "*take all necessary actions in furtherance of* the … pursuit of [the] civil forfeiture of the [defendant funds." Gov't App'x L.A. 272, ¶ 20 (emphasis added). There is nothing new about this evidence. The stipulation binds the parties, and is on point. Had the parties not stipulated to the existence *and* the relevant contents of the OFAC license, we may have reached a different conclusion. For we agree with the dissent that it is odd for the United States to place so much stock in something that is not a part of the record. But the presence of the stipulation, which includes a stipulation to the broad, operative terms of the license, quells any concern regarding the completeness of the record.

Indeed, the stipulation provides this court with ample information. For example, the stipulation tells us that OFAC issued the license. That means it qualifies as "a license issued by the United States Government … ." 116 Stat. 2322, 2339. The stipulation next tells us that the license was issued to the DOJ. That means "a person subject to the jurisdiction of the United States" is its intended recipient. *Id; see also* 116 Stat. 2322, 2326 (defining person, in part, as a "governmental unit"). As for its scope, the stipulation expressly contemplates a broad one: it allows the DOJ to "take all necessary actions in furtherance of" civil forfeiture. Gov't App'x L.A. 272, ¶ 20. That satisfies the purpose criterion, which requires

the license to be "for final payment, transfer, or disposition." 116 Stat. 2322, 2339.

A license to effect forfeiture is, at bottom, a license for final transfer or disposition. *Cf. Holy Land*, 722 F.3d at 687. Our conclusion on this latter point rests not only on the Fifth Circuit's implied decision in *Holy Land*, but also on the nature of forfeiture itself. Forfeiture, let's not forget, is both a process and a desired end state. The United States' desired end state is ownership of al Tayyeb's funds, a final disposition it prefers to limbo, or worse, possession by al Qaeda for terrorist operations. That helps explain why, after securing the OFAC license, the United States arrested and took possession of the funds on July 12, 2011. The license at issue enabled that arrest, just as it ultimately enables the final transfer of the funds from al Tayyeb. As a result, the stipulated terms of this license qualify it as one for "final … transfer, or disposition … ." 116 Stat. 2322, 2339.

Each of these critical facts flows directly from the parties' stipulation to the license, and they weigh in favor of finding the funds to no longer be "blocked"—at least as TRIA defines the term. We respectfully disagree, therefore, with the dissent's contention that the stipulation is too vague to carry any real meaning on appeal. The stipulation carries significant meaning. When coupled with the arrested nature of the funds, it reveals the funds are no longer blocked within the statutory meaning of TRIA.

Additionally, that the stipulation does not state whether OFAC issued the license "in connection with a transaction for which the issuance of such a license has been specifically required by statute other than the International Emergency Economic Powers Act … or the United Nations Participation

Act of 1945," 116 Stat. 2322, 2339–40, does not alter our conclusion. Whether a certain statute requires the issuance of a license is a question of law; it need not be addressed by the parties' stipulation.

Here, that question of law is not in dispute. Appellees make no argument on appeal that either the International Emergency Economic Powers Act ("IEEPA") exemption or the United Nations Participation Act of 1945 ("UNPA") exemption preserves these funds as blocked, so as to subject them to attachment under TRIA. Pub. L. No. 107-297, § 201(d)(2)(B)(i), 116 Stat. 2322, 2339–40. Nor did Appellees develop such an argument before the district court. This issue, consequently, is deemed waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2014).

Nevertheless, the dissent relies heavily on this portion of TRIA. Citing 31 C.F.R. §§ 594.101 and 594.502(b), the dissent essentially contends that IEEPA required the forfeiture license because IEEPA blocked the assets. It follows, the dissent concludes, that the funds must remain blocked (and subject to attachment under TRIA) because the IEEPA exemption applies.

Putting to one side the fact that Appellees (or the United States, for that matter) did not brief this issue, we see things differently than the dissent does. IEEPA empowers the President to exercise "emergency economic powers in response to peacetime crises." *Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although OFAC invoked IEEPA, among other authorities, to block al Tayyeb's funds on June 18, 2006, its powers under IEEPA are not unlimited: "IEEPA does not authorize the Executive to take title to foreign assets, to regulate purely domestic transactions, to regulate gold or bullion,

or to seize records." *United States v. Ali Amirnazmi*, 645 F.3d 564, 572 n.12 (3d Cir. 2011) (citing *Regan*, 468 U.S. at 228 n.8 (citation omitted).[7] IEEPA, for example, does not speak of applications for warrants of arrest *in rem*. The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, on the other hand, do.

The utility of TRIA's IEEPA exemption, moreover, is revealed by other circuits that have not applied it under similar circumstances. *See Holy Land*, 722 F.3d at 685 (refraining from applying TRIA's IEEPA exemption to funds subject to an OFAC license even though the funds there were initially blocked pursuant to IEEPA); *Bank of N.Y. v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007) (per curiam) (same). These decisions are incompatible with the dissent's view. What is more, once the United States executed its warrants of arrest *in rem*, the funds—at least by that point—were no longer "seized or frozen" as TRIA contemplates the terms—a threshold requirement that obviates the dissent's discussion on this point altogether. Instead, the funds were seized under civil forfeiture. We cannot overlook that fact.

Appellees next argue waiver. In their view, the United States waived the issue of the blocked (or unblocked) status of the defendant funds when it advanced the argument only in its reply brief before the district court. We reject this ar-

---

[7] We acknowledge that Congress granted the President additional authority to confiscate foreign property, subject to certain conditions, when it amended IEEPA in 2001. *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56, § 106, 115 Stat. 272, 277–78 (Oct. 26, 2011).

gument as well. It disregards the relevant procedural history of the case, which was impacted by the Fifth Circuit's decision in *Holy Land*, 722 F.3d at 677.

There, the Fifth Circuit addressed a TRIA action brought by victims of a Hamas terrorist attack in Jerusalem. *Id.* at 680. Specifically, the victims sought to satisfy their judgment against Hamas by executing on the blocked funds of its fundraising wing in the United States—Holy Land Foundation. *Id.* at 680–82. Like here, OFAC issued a license to the United States "to pursue criminal forfeiture of the [blocked] assets … ." *Id.* at 687. And like here, the United States restrained (in our case, "arrested") the "assets to preserve them for potential criminal forfeiture." *Id.* The Fifth Circuit found that the license, coupled with the restrained status of the funds, rendered them unblocked under TRIA. *Id.* (citations omitted). The United States took notice.

Realizing the relevancy of the *Holy Land* case, the United States filed an unopposed motion before the district court to address its holding before the parties finished briefing their cross motions for summary judgment. Although the district court denied the motion, it instructed both parties to address the case in their remaining briefs. This record belies any claim that the United States waived the issue of the status of the funds. The United States acted like a party seeking to preserve an issue, not waive it. And it did just that.

On the impact of the July 8, 2011, OFAC license and the July 12, 2011, arrest of the funds, we are persuaded by the Fifth Circuit's analysis. These funds are now part of an OFAC licensing scheme, they are arrested, and they therefore outside the ambit of TRIA. The statute does not "reach those funds which the government has been given authori-

zation to control through another means." *Holy Land*, 722 F.3d at 685, 688 (observing that "[t]he definition of 'blocked assets' set forth in TRIA *is narrow*") (emphasis added). Consequently, and for all the reasons discussed above, Appellees cannot execute on these funds. They are excluded from the definition of "blocked assets" under the statute. Pub. L. No. 107-297, § 201(d)(2), 116 Stat. 2322, 2339. Other courts are in accord. *See Rubin*, 484 F.3d at 150 (finding assets subject to a general licensing scheme to be unblocked and not subject to attachment under TRIA); *Estate of Heiser*, 807 F. Supp. 2d at 18 n.6 ("Thus, because transactions … are undertaken under an OFAC licensing scheme, they are unblocked and not subject to attachment.").

In an effort to prevent this result, Appellees point out that OFAC issues two types of licenses: general licenses and specific licenses. While general licenses may render funds unblocked, specific licenses, they argue, do not. Unfortunately for Appellees, TRIA does not support this argument. The text of TRIA makes no distinction between—or mention of—"specific" or "general" licenses. Rather, the statute broadly excepts any property subject to "*a license* issued by the United States Government," subject to certain conditions, from qualifying as a blocked asset. Pub. L. No. 107-297, § 201(d)(2), 116 Stat. 2322, 2339–40 (emphasis added).

That leaves the purpose of the statute as Appellees' last best hope for recovery. But as we stated before, a statute's purpose cannot defy the unambiguous and plain meaning of its text. *See Suesz*, 757 F.3d at 659 (Kanne, J., dissenting). Whereas here, the text leaves no room for debate, we do not close our eyes to it.

Having found the funds to no longer be blocked (as TRIA defines the term), Appellees cannot proceed under that statute. Consequently, the parties' arguments concerning TRIA's waiver of sovereign immunity are moot. Without any waiver of sovereign immunity, Appellees cannot attach the defendant funds, now seized and held by the United States, to satisfy their judgment against al Qaeda. *See Dep't of the Army v. Blue Fox*, 525 U.S. 255, 264 (1999) ("[S]overeign immunity bars creditors from attaching or garnishing funds in the Treasury[.]"); *see also Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53, 58 (D.D.C. 2003) ("[I]f the property sought to be attached by plaintiffs is property that (1) has been seized by the United States from a terrorist party and (2) is presently held by the United States, it cannot be attached … ."). The United States' remaining arguments concerning *in custodia legis*, and prior exclusive jurisdiction are moot.

We pause to make some observations. First, we are mindful of the dissent's concern regarding the litigation tactics of the Executive Branch. That the Executive Branch could delay revealing the existence of these particular funds, and then employ measures designed specifically to take them outside the scope of TRIA—a remedial statute—smacks of gamesmanship. But the United States' approach to litigating this case falls within the bounds of what Congress permitted when it enacted this iteration of TRIA. It is not the function of the courts to disturb the policy judgments of the Legislative Branch.

Finally, it is unfortunate, to say the least, that the victims of September 11 are still seeking relief, all these years later, for their tragic losses. For that we reason, we are also mindful of the United States' concession at oral argument that the

victims of al Qaeda will be allowed to use the remission process to submit claims for relief. If that process proves to be inadequate, perhaps Congress can revisit TRIA to strengthen its means of recovery for victims of terror.

### III. CONCLUSION

For the foregoing reasons, we find Appellees possess constitutional and statutory standing. Nevertheless, their actions under TRIA ultimately fail. TRIA is no doubt a remedial statute. Its purpose, however, cannot save a ruling that offends its text. By the time Appellees filed their initial, verified claims, OFAC had already issued its license and the funds had already been arrested to preserve them for forfeiture. In sum, the funds were no longer blocked. To Appellees, that result may seem unfair, but it is the only permissible reading under the statute. For these reasons, as well as the reasons discussed above, we VACATE the grant of summary judgment in favor of Appellees and REMAND this case with instructions to enter summary judgment in favor of the United States.

MANION, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the court that the insurance companies have standing. However, I disagree with the court's conclusion that the forfeiture license and the *in rem* arrest warrants prevent the insurance companies from recovering the funds. Neither the forfeiture license nor the arrest warrants changed the status of the funds as blocked under the Terrorism Risk Insurance Act ("TRIA"), and the funds remain accessible by the insurance companies. For these reasons, I respectfully dissent.

## I. Blocked funds and TRIA.

The International Emergency Economic Powers Act ("IEEPA") gives the President the power to block, i.e., freeze, assets in response to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B); *see also Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 267 (2d Cir. 2003). The United Nations Participation Act ("UNPA") empowers the President to apply measures to enforce economic and communication sanctions called for by the United Nations Security Council. 22 U.S.C. § 287c. After the terrorist attacks of September 11, 2001, the President invoked these powers to issue Executive Order 13224 to block the assets of designated terrorists, terrorist organizations, and foreign persons who support these terrorists. 66 Fed. Reg. 49079-83 (Sept. 25, 2001). The Department of the Treasury's Office of Foreign Assets Control ("OFAC") promulgated the Global Terrorism Sanctions Regulations ("GTSR") to implement Executive Order 13224. 68 Fed. Reg. 34196-97 (June 6, 2003). "Except as authorized by statutes, regulations, orders, direc-

tives, rulings, instructions, licenses or otherwise," funds that are blocked under GTSR "may not be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. § 594.201(a).

"To ensure the continued financial capacity of insurers to provide coverage for risks from terrorism," Congress passed the Terrorism Risk Insurance Act ("TRIA"). Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002). In addition to a general terrorism insurance program, TRIA gives victims of terrorism the ability to execute judgments on terrorist assets that are blocked (i.e., "seized or frozen") under IEEPA. § 201(a), 116 Stat. at 2337. The question before the court is whether the funds are considered blocked under TRIA. If the funds are blocked, they are available to satisfy the insurance companies' judgments. If the funds are instead considered "unblocked" under TRIA, they are no longer available to satisfy judgments.

The parties stipulated that OFAC blocked the funds on June 18, 2007, pursuant to Executive Order 13224, IEEPA, and GTSR. Gov't App'x L.A. 272, 18. This action by OFAC brought the funds within the ambit of TRIA and made them eligible to satisfy the judgments of the insurance companies. However, the parties also stipulated that OFAC issued a license to the DOJ on July 8, 2011 to "take all necessary actions in furtherance of the … pursuit of [the] civil forfeiture of the [defendant funds]." *Id.* at 20. The license allowed the government to move forward with its complaint for civil forfeiture, which it filed on June 19, 2011. In furtherance of the forfeiture action, the district court issued *in rem* arrest warrants for the funds on July 12, 2011. The district court took possession of the funds on July 14, 2011. Gov't App'x L.A. 15. So, the more specific question is whether the forfeiture license or arrest warrants changed the

status of the funds under TRIA from blocked to unblocked. As explained below, neither the forfeiture license nor the arrest warrants unblocked the funds under TRIA.

## II. The effect of the license.

As mentioned, the parties stipulated that OFAC blocked the funds pursuant to GTSR, 31 C.F.R. § 594.101, *et seq*. Those regulations contain the following provisions:

> No regulation, ruling, instruction, or license authorizes any transaction prohibited under this part unless the regulation, ruling, instruction, or license is issued by [OFAC] and specifically refers to this part. No regulation, ruling, instruction, or license referring to this part shall be deemed to authorize any transaction prohibited by any provision of this chapter unless the regulation, ruling, instruction, or license specifically refers to such provision.

31 C.F.R. § 594.502(b). To put it another way, if OFAC blocked the assets under GTSR, then OFAC can unblock the assets by a license only if the license specifically refers to GTSR and the specific provision used to block the assets. The limitation is more than a simple requirement to reference the provision that originally blocked the assets:

> No license or authorization contained in or issued pursuant to those other parts [of the OFAC chapter] authorizes any transaction prohibited by this part. No license or authorization contained in or issued pursuant to any other provision of law or regulation authorizes any transaction prohibited by this part.

31 C.F.R. § 594.101. Therefore, if OFAC blocked the assets under GTSR, then OFAC can unblock the assets by a license only if the license is issued under GTSR. For this reason, the forfeiture license must have been issued pursuant to GTSR if it was a valid license. Furthermore, a valid license issued under GTSR is construed narrowly:

> Any regulation, ruling, instruction, or license authorizing any transaction otherwise prohibited under this part has the effect of removing a prohibition contained in this part from the transaction, *but only to the extent specifically stated by its terms*.

31 C.F.R. § 594.502(c) (emphasis added).

Thus, the forfeiture license permitted the DOJ to "take all necessary actions in furtherance of the … pursuit of [the] civil forfeiture of the [defendant funds]" and nothing more. Gov't App'x L.A. 272, 20. So, although the license unblocked the funds so that the government could obtain arrest warrants in furtherance of its civil forfeiture action, the license did not unblock the funds for the terrorist Muhammad Abdallah Abdan Al Ghamdi ("al Tayyeb") or anyone else. Clearly, if the government fails in its civil forfeiture action, the funds are not then available to al Tayyeb. In short, the funds are still blocked for all other purposes. The government concedes this fact. *See* Gov't Reply Br. 18 ("The government, however, has not argued that OFAC issued a general license completely lifting the order it imposed in 2007. Rather, OFAC allowed the government to take all necessary action to subject the defendant funds to

forfeiture."). The license, by its terms, did not unblock the funds for the purposes of TRIA.[1]

There is, though, a way in which a license can unblock funds for purposes of TRIA without unblocking the funds under GTSR. It involves TRIA's definition of blocked assets but, as explained below, it does not apply here.[2]

### III.  The TRIA license exclusion.

TRIA excludes from its definition of blocked assets property that is subject to a license that meets four specific criteria: the license must be 1) issued by the United States Government; 2) for final payment, transfer, or disposition; 3) for a transaction by or to a person subject to the jurisdiction of the United States; and 4) specifically required by a statute *other than* IEEPA or UNPA. § 201(d)(2)(B)(i), 116 Stat. at 2339–40 (emphasis added). Assets subject to a license that meets the above criteria are considered "unblocked" for the purposes of TRIA even though they are still blocked for other purposes (except, of course, for whatever purpose is authorized by the license). There is no dispute that the forfeiture license was issued by the

---

[1] As a general matter, even though TRIA is dependent on IEEPA and regulations like GTSR to block funds, its mechanisms for attachment operate outside of those laws. *See Estate of Heiser v. Bank of Tokyo Mistubishi UFJ,* 919 F. Supp. 2d 411, 422–23 (S.D.N.Y. 2013) (accepting representations by the United States that an OFAC license is not required to authorize the release of blocked assets subject to TRIA).

[2] Although the parties did not argue this issue with specificity on appeal, they raised the overarching issue of whether the forfeiture license unblocked the funds under TRIA. An examination of that issue requires an examination of TRIA's definition of blocked assets. Therefore, the issue is not waived.

United States and involves a person subject to the jurisdiction of the United States. So, of the four criteria, only the second and fourth remain for the court to decide. If the license is either not for final payment, transfer, or disposition or if the license is required by either the IEEPA or UNPA, then the funds are still eligible to satisfy the insurance companies' judgment. Of course, had the government disclosed the forfeiture license we might easily discern the answer. But since the government has not disclosed it, further analysis is necessary.

### A. The stipulated language is insufficient to conclude that the license is for final disposition.

The stipulated language is too vague to establish that the forfeiture license is a license for final disposition. True, the award of the funds to the government according to a final judgment of forfeiture would be a final disposition. And, it is conceivable that a license could authorize the government to take title to the funds only if and when the district court enters final judgment in the government's favor. But, the stipulated language does not say these things. The stipulated language says only that the license authorizes the DOJ to "take all necessary actions in furtherance of the … pursuit of [the] civil forfeiture." Gov't App'x L.A. 272, 20. Before the court holds that the license is for final disposition, it should consider what the original language of the license might say. What is underneath the ellipsis? Does the addition of the second "the" change the original meaning? Could it be that OFAC authorized the DOJ to take all necessary actions in furtherance of the *filing of a complaint in* pursuit of civil forfeiture? Or, perhaps OFAC authorized the DOJ to take all necessary actions in furtherance of the *restraining orders required for the* pursuit of

civil forfeiture? Until the government discloses the forfeiture license we will not know.

### B. *The license was required by IEEPA and UNPA.*

Even if the forfeiture license were a license for final disposition, the assets are not excluded from TRIA's definition of blocked assets because the license does not meet the fourth requirement that the license be required by a statute other than the IEEPA or UNPA. As explained previously, the forfeiture license must have been issued under GTSR in order to constitute a valid license. *Infra* at 37. An examination of GTSR's authority reveals that its substantive authority (i.e., its authority for blocking and licensing) is derived from IEEPA and UNPA. *See* 31 C.F.R. § 594.101, Statutory Authority (authority note applicable to entire part); *see also* 68 Fed. Reg. 34196-97. Hence, any license issued under GTSR is issued under IEEPA and UNPA, and any license required by GTSR is required by IEEPA and UNPA.

It follows that the forfeiture license cannot meet the requirements of TRIA's exclusion: To be a valid license, OFAC must have issued the forfeiture license under GTSR and, consequently, under IEEPA and UNPA. If so, then the license was not issued "in connection with a transaction for which the issuance of such license has been specifically required by statute *other than* [IEEPA] or [UNPA]" as required by TRIA's exclusion. § 201(d)(2)(B)(i), 116 Stat. at 2339-40 (emphasis added). If, on the other hand, OFAC did not issue the forfeiture license under GTSR, then it is not a valid license at all and the funds are not "subject to a license" as required by TRIA's exclusion. *Id.* at 2339. In either of the only two possible cases (issued under GTSR or not) the license does not satisfy the

requirements of TRIA's exclusion. Consequently, the funds are not considered unblocked by TRIA's exclusion.

## IV. *United States v. Holy Land.*

The government invites us to rely on the Fifth Circuit's decision in *United States v. Holy Land Found. for Relief and Dev.*, 722 F.3d 677 (5th Cir. 2013), to hold that since the license unblocked the funds for the purposes of the forfeiture proceeding, thereby making them available to any qualified claimant, the funds are no longer blocked under TRIA.[3] The Fifth Circuit, however, did not hold that the OFAC license in its case unblocked the assets. Rather, it held that "the government essentially unblocked HLF's assets when it obtained a restraining order under 21 U.S.C. § 853(e)(1)(A) to pursue the criminal forfeiture of those assets." *Id.* at 685.

The license in *Holy Land* stated that it "authorized the government 'to pursue criminal forfeiture of the assets of the Holy Land Foundation for Relief and Development ("HLF") blocked pursuant to' Executive Orders 12947 and 13224" and "further authorized the government to pursue 'restraining orders' in order to preserve the assets for criminal forfeiture." *Id.* at 687. The plaintiffs in *Holy Land* could not satisfy their judgment because "[o]nce an indictment had been filed and the assets restrained, victims of terrorism could no longer execute against those assets … TRIA could not be applied to those funds since they no longer qualified as blocked under that statute." *Id.* (citations omitted).

---

[3] From all indications, it appears that the Fifth Circuit in *Holy Land* had the benefit of a copy of the forfeiture license in the record, a benefit not provided by the government in this case.

The reason given by the Fifth Circuit for this result was twofold: First, "TRIA specifically limits the definition of 'blocked' assets to those that are seized or frozen under … the Trading with the Enemy Act or … IEEPA." *Id.* at 685. And, second, TRIA "does [not] reach those funds which the government has been given authorization to control through another means." *Id.* In other words, because the government was given authorization to control the funds in *Holy Land* through the restraining orders, the Fifth Circuit held that the funds were no longer blocked under IEEPA.[4] And, since the funds were no longer blocked under IEEPA, they were no longer reachable by TRIA.

The Fifth Circuit's conclusion is wrong, and the reason why should be obvious from the discussion above. The forfeiture license in *Holy Land* never unblocked the funds under IEEPA. Rather, *despite the fact that the funds were still blocked under IEEPA*, the license allowed the forfeiture action to proceed. The Fifth Circuit stated this exactly, but did not recognize the inconsistency: "*Notwithstanding the status of HLF's assets as blocked*, the government's receipt of a license from OFAC restrained those assets and permitted the government to proceed with the criminal forfeiture process." *Id.* at 687 (emphasis added). Similarly here, as the government concedes, OFAC did not issue a license completely lifting its blocking order imposed in 2007. Instead, it issued a specific license allowing for the government's forfeiture action and nothing more. Therefore, *Holy Land* provides no reason to hold that the license or the arrest warrants unblocked the funds.

---

[4] The assets in *Holy Land* were blocked under IEEPA, not the Trading With the Enemy Act. *Holy Land*, 722 F.3d at 685.

Another reason not to accept the Fifth Circuit's conclusion is that it provided no authority for its premise that TRIA cannot reach those funds which the government has been given authorization to control through other means. The Fifth Circuit did cite the D.C. District Court and Second Circuit as authorities which—the Fifth Circuit thought—have decided that assets subject to licenses are unblocked under TRIA. *Id.* (citing *Estate of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011), and *Bank of N.Y. v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007)). An examination of both cases, however, reveals that they were not decided as the Fifth Circuit understood.

In *Estate of Heiser*, the plaintiffs sued the Telecommunications Company of Iran under the Foreign Sovereign Immunities Act ("FSIA") in order to attach payments owed to the telecommunications company. *Estate of Heiser*, 807 F. Supp. 2d at 16–18. The plaintiffs chose not to sue under TRIA because of the paucity of blocked Iranian assets available for attachment. *Id.* at 15. They chose instead to sue under the FSIA because it allows plaintiffs to attach the property of state agencies or instrumentalities when they cannot attach the property of the state itself. *Id.* at 15–16, 18. Since OFAC's Iranian Transactions Regulations contained a general license that "unblocked" payments to telecommunication companies that handled traffic between the United States and Iran, the plaintiffs attempted to attach payments owed by Sprint to the Telecommunications Company of Iran. *Id.* at 16–17. In a footnote, the district court noted:

> Here, the payments owed from Sprint to [sic] TIC are neither seized nor frozen; instead, they are made under a general license permitting

> payments incident to telecommunications traffic. … Thus, because transactions between Sprint and [sic] TIC are undertaken under an OFAC licensing scheme, they are unblocked and not subject to attachment.

*Id.* at 18 n.6. The Fifth Circuit misunderstood this discussion to mean that the district court held that blocked assets subject to a license (such as we have here) are unblocked. That is not what the district court said. Rather, the district court explained that the payments between the telecommunication companies were never blocked because the OFAC general license removed all such transactions from the sanction regulations' prohibitions. Since the payments were never blocked to begin with, TRIA was inapplicable.

This is why the distinction between general and specific licenses is important. GTSR defines a general license as "any license or authorization the terms of which are set forth in subpart E of this part" and a specific license as "any license or authorization not set forth in subpart E of this part but issued pursuant to this part."[5] 31 C.F.R. §594.307. Subpart E of the GTSR contains regulations that authorize specific types of transactions. *See, e.g.*, 31 C.F.R. § 594.517 ("receipts of payment of professional fees and reimbursement of incurred expenses for the provision of legal services authorized pursuant to § 594.506(a) are authorized from funds originating outside the United States"). A general license, then, is not so much a license as a regulation preventing assets from being blocked in

---

[5] Each part of the OFAC regulations contains its own definitions so it is necessary to examine the definitions specific to the sanction regime at issue. *See* 31 C.F.R. § 501.301.

the first place. In contrast, a specific license is a license issued under the authority of the regulations that is necessary to unblock assets that the regulations have at first blocked. In this case we are dealing with a specific license that unblocked the funds for the purposes of forfeiture.

The second case relied upon by *Holy Land* made the same distinction. In *Bank of N.Y.*, the Second Circuit adopted the reasons of the "fine opinion below" and stated:

> [W]e hold that assets blocked pursuant to Executive Order 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979), and its accompanying regulations, *see* 31 C.F.R. Part 535, that are also subject to the general license of 31 C.F.R. § 535.579, are not blocked assets under the TRIA and therefore are not subject to attachment under that statute.

*Bank of N.Y.*, 484 F.3d at 150. Below, the district court explained: "This license [31 C.F.R. § 535.579(a)] has the effect of removing a prohibition or prohibitions in subpart B from the transaction. … Accordingly, transactions authorized by the general license would not be blocked by Section 535.201." *Bank of N.Y. v. Rubin*, 2006 U.S. Dist. LEXIS 10215 at *9 (S.D.N.Y. Mar. 15, 2006) (quotation omitted). The license at issue in *Bank of N.Y.* was not a specific license of the type at issue here or in *Holy Land*, but a regulation put in place to effectuate the "Algiers Accords" where "most Iranian assets in the United States were unblocked and the trade embargo was lifted." *Id.* at *8. Therefore, as with *Estate of Heiser*, *Bank of N.Y.* concerns a general license that is really a regulation that removes the prohibition from the law, not a specific license that unblocks assets for a specific purpose that were blocked by an OFAC order. Thus, it stands that assets subject to a general license are

not blocked for the purposes of TRIA because a general license is a regulation that removes the prohibition against the assets so that the sanction regulations do not block the assets in the first place. *See Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 67–68 (E.D.N.Y. 2004). That is not the case here.

### V. Conclusion.

For the reasons explained above, neither the forfeiture license nor the arrest warrants in this case unblocked the funds for the purpose of TRIA. Consequently, the funds are still blocked and available to satisfy the insurance companies' judgment. To hold otherwise would render meaningless our opinion that TRIA's "notwithstanding" clause supersedes civil forfeiture standing requirements. We are compelled to hold that TRIA supersedes civil forfeiture standing requirements because "once the United States commences a forfeiture action, it is impossible for qualified albeit unrelated victims of terror (here, the insurance companies) to comply with civil forfeiture's innocent owner requirement *and*, at the same time, execute against the blocked funds." *Ante* at 20. Yet, as the government explains, "To secure the *in rem* jurisdiction, the district court was required to arrest or judicially restrain the defendant funds." Gov't Reply Br. 26 n.23 (citing *United States v. All Funds Distributed To Weiss*, 345 F.3d 49, 55 (2d Cir. 2003) (possession or restraint of the defendant *res* is necessary for the district court to secure its *in rem* jurisdiction.)).[6] If an OFAC forfeiture license with an arrest warrant or restraining order unblocks blocked assets, plaintiffs who are "allowed to enter the courthouse" through TRIA's "notwithstanding" clause will

---

[6] An examination of Rule G(3)(b) of the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture also reveals this to be the case.

never obtain relief since every forfeiture action against blocked funds requires an OFAC license and an arrest warrant or restraining order.

Finally, since neither the license nor the arrest warrants unblock the funds under TRIA, it is necessary to address the government's sovereign immunity argument. The government argues that the insurance companies cannot attach the funds because TRIA does not waive the government's sovereign immunity. The district court, however, correctly found that Congress had waived the government's sovereign immunity through TRIA. We should adopt the district court's reasoning and reach the same conclusion. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038, 1043–45 (N.D. Ill. 2012).

All that said, perhaps what is most troubling about this case is that the Executive Branch has dictated the pace of this proceeding at every turn and continually stonewalled the insurance companies' efforts to satisfy their judgment against terrorist assets. The funds were blocked by the government from 2007 to 2011. After ignoring FOIA requests from the insurance companies for years on the grounds that they were exempt from disclosure for reasons of national security, the government finally disclosed the identity of the blocked assets when, in June 2011, the government initiated a forfeiture proceeding against them.[7] In August 2011, the insurance

---

[7] In July 2003, the insurance companies sent FOIA requests to relevant federal agencies including the Treasury Department and the DOJ seeking "identification of assets belonging to" al-Qaeda and approximately 192 other Executive Order 13224 terrorist designees. In 2005, the insurance companies brought suit to obtain this information. In October 2006, Treasury asserted that information was exempt from disclosure. In June

companies timely asserted their interests. The government resisted, but lost in the district court. Now, on appeal, the government argues that its acquisition of a forfeiture license unblocked the assets, and because the assets are unblocked they are no longer within the ambit of TRIA. Because the court accepts this argument, the insurance companies are out of luck, and the assets will be forfeited to the government without ever seeing the light of day. The government accomplishes this *coup d'état* despite the fact that the forfeiture license that is the lynchpin of its theory is not in the record, so we do not have the complete picture of its contents. Perhaps that is why the government used the *coup de main* of stipulating to a vague description of the unseen forfeiture license.

For these reasons, I would affirm the judgment of the district court.

---

2008, the insurance companies submitted an amended FOIA request for "any and all documents from the DOJ's Criminal Division identifying assets belonging to the foreign states, terrorism-related entities and individuals … ." In October, 2008, the DOJ-Criminal Division responded that "as of August 5, 2008, the AFMLS has reported that they do not have any records of assets pertaining to the individuals and entities named in your request." In December 2008, the government prevailed in the FOIA suit.