# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 15, 2010      Decided September 10, 2010

No. 09-5147

MICHAEL BENNETT AND LINDA BENNETT, INDIVIDUALLY AND AS CO-ADMINISTRATORS OF THE ESTATE OF MARLA ANN BENNETT, DECEASED,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:03-cv-01486-RCL)

*John Vail* argued the cause for appellants. With him on the briefs was *Thomas Fortune Fay*.

*Samantha L. Chaifetz*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Douglas N. Letter*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Opinion concurring in the judgment filed by *Circuit Judge* GARLAND.

GRIFFITH, *Circuit Judge*: To satisfy a default judgment against the Islamic Republic of Iran and the Iranian Ministry of Information and Security, Michael and Linda Bennett obtained writs of attachment against five of Iran's former diplomatic properties located in the District of Columbia. The United States intervened and moved to quash the writs on the ground that section 201 of the Terrorism Risk Insurance Act precluded the attachments. The district court granted the government's motion, and we affirm.

**I.**

The Bennetts' daughter, Marla Ann, was a student at Hebrew University in Jerusalem when a bombing at the school took her life. Hamas claimed responsibility for the murder. The Bennetts sued in the district court alleging that Iran's support for Hamas played a part in the bombing that killed their daughter. The Bennetts won a default judgment against Iran in excess of $12 million. *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117 (D.D.C. 2007).

To satisfy the judgment, the Bennetts obtained writs of attachment against Iran's former embassy, ambassador's residence, and another diplomatic residence, as well as two parking lots. The United States has been the custodian of these properties since April 7, 1980, when it cut diplomatic ties with Iran in response to the take-over of the American Embassy in Tehran. *See* U.S. Dep't of State Office of the Legal Adviser, Digest of United States Practice in International Law 1980, at 40–41, 333–34; *see also* Exec.

Order No. 12,170, 3 C.F.R. 457 (1980) (freezing Iranian assets in the United States). The United States has held Iran's diplomatic and consular properties for the past thirty years pursuant to Article 45 of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, which requires signatory states to "respect and protect" the premises and property of a mission if diplomatic relations are severed or a mission is recalled, and the Foreign Missions Act, 22 U.S.C. § 4305(c)(1) (2006), which authorizes the Secretary of State to "protect and preserve" the property of a foreign mission that has ceased conducting diplomatic activities in the United States.

The United States intervened in the post-judgment proceeding and moved to quash the writs on the ground that the properties were not subject to attachment. The district court granted the government's motion. *Bennett v. Islamic Republic of Iran*, No. 03-1486 (D.D.C. Mar. 31, 2009). The Bennetts appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Whether the properties are subject to attachment is a question of law that we review de novo. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

## II.

Diplomatic properties are generally immune from attachment. *See* 28 U.S.C. §§ 1609–1610. The Terrorism Risk Insurance Act (TRIA) carves out an exception to this general rule, authorizing the attachment of "blocked assets" of state sponsors of terrorism to satisfy judgments for compensatory damages for acts of terrorism. Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 note). TRIA defines blocked assets as those "seized or frozen by the United States" for certain foreign policy purposes. *See*

*id.* § 201(d)(2)(A). Blocked assets do not include, however, "property subject to the Vienna Convention on Diplomatic Relations"[*] that "is being used exclusively for diplomatic or consular purposes." *Id.* § 201(d)(2)(B)(ii). Such property may not be attached.

The government and the Bennetts agree that the properties subject to the writs are seized assets belonging to a state sponsor of terrorism and that their attachment would satisfy a judgment for compensatory damages for an act of terrorism. The parties contest, however, whether the properties are subject to the Vienna Convention on Diplomatic Relations and "[are] being used exclusively for diplomatic or consular purposes." TRIA § 201(d)(2)(B)(ii). The Bennetts concede that all the properties except the diplomatic residence are subject to the Vienna Convention. They have forfeited the argument that the residence is not because they raised it for the first time on appeal. *See Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009). That leaves us with only the question of whether the properties are "being used exclusively for diplomatic or consular purposes." TRIA § 201(d)(2)(B)(ii).

The United States claims that it has held the attached properties in custody since 1980 to fulfill its obligations under Article 45 of the Vienna Convention to "respect and protect" the premises of a former mission after diplomatic relations between two states have been severed, as well as the Foreign Missions Act. *See* Decl. of Claude J. Nebel, Deputy Assistant

---

[*] TRIA defines "property subject to the Vienna Convention on Diplomatic Relations" as property for which "the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under [the] Vienna Convention." TRIA § 201(d)(3).

Sec'y for Diplomatic Sec. & Deputy Dir. of the Office of Foreign Missions, July 11, 2008, ¶ 10. On March 10, 1983, the United States announced that it would rent out Iran's diplomatic properties periodically to generate income to pay for the upkeep required by the Vienna Convention. *Id.* ¶ 11. Since then, the United States has at times rented Iran's properties to other foreign missions and to private parties and used the proceeds to maintain and repair the properties consistent with its treaty obligations. Any excess income from the rentals has been placed in an Iranian bank account that, like all Iranian assets in America, has been frozen by the United States. *Id.* ¶ 12.

There is no dispute that the United States has used these properties for a diplomatic purpose. The Bennetts have conceded this point. Appellants' Br. at 16. According to the government, that concession resolves the dispute because the sole inquiry under the statute is the purpose for which the United States uses the properties. The Bennetts insist that the statute requires us to look at the nature of the use as well.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004). The Bennetts contend that renting the properties to third parties is a nondiplomatic use, which makes the properties subject to attachment. Their argument assumes that TRIA's protection from attachment requires a diplomatic *use* of the property. That requirement finds no support in the text of the statute, which provides only that the property "is being used exclusively for diplomatic and consular *purposes*." TRIA § 201(d)(2)(B)(ii) (emphasis added). The adjectives "diplomatic" and "consular" modify the noun "purpose," not

the verb "used." We read the verb phrase "is being used . . . for" to carry its ordinary meaning of "ma[de] instrumental to an end or process." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2524 (Philip Babcock Gove ed., Merriam-Webster Inc. 1981). The statute provides that the property retains its immunity from attachment only so long as it "is being used exclusively for diplomatic and consular purposes." TRIA § 201(d)(2)(B)(ii). The Bennetts cite several cases from our sister circuits interpreting what they consider to be analogous portions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602–11. *See, e.g.*, *Conn. Bank of Commerce v. Republic of Congo*, 308 F.3d 240, 251–52 (5th Cir. 2002) (interpreting a provision permitting attachment of property "used for a commercial activity"); *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987) (construing the commercial activity exception to foreign sovereign immunity, which "focus[es] on the nature of the transaction at issue rather than its purpose"). But unlike the provisions at issue in those cases, TRIA, by its plain language, is concerned only with the *purpose* for which the property is used, and not the way the property is used in service of that end.

The Bennetts argue that our reading of section 201(d)(2)(B)(ii) is mistaken because it fails to take into account section 201(b)(2)(A) of TRIA, which creates another means to protect from attachment properties subject to the Vienna Conventions. Section 201(b)(2)(A) authorizes the President to immunize such properties from attachment so long as they have not "been used by the United States for any nondiplomatic purpose (including use as rental property)." TRIA § 201(b)(2)(A). The parenthetical phrase, the Bennetts argue, establishes that any "use" of a seized asset "as a rental property" invariably has a nondiplomatic purpose. Not only is that not true as a descriptive matter, but that view of the

provision cannot be squared with its plain meaning, which calls for an inquiry into the purpose of the use and not the type of use—the same inquiry required by section 201(d)(2)(B)(ii). Far from announcing a categorical rule that any "use as a rental" is in pursuit of a "nondiplomatic purpose," the parenthetical simply acknowledges that the government may have a nondiplomatic purpose for renting the property.

We are equally unpersuaded by the Bennetts' argument that our interpretation of section 201(d)(2)(B)(ii) renders this provision superfluous because it duplicates protection already found in the Foreign Missions Act. Unlike two provisions within a single statute, we need not construe separate statutes to avoid redundancy. *Cf. U.S. ex rel Miller v. Bill Harbert Intern. Const., Inc.*, 608 F.3d 871, 885-86 (D.C. Cir. 2010) (regarding as effective overlapping statutes capable of coexistence). In any event, these statutes are not duplicative. To be sure, the Foreign Missions Act prohibits attachment of foreign mission property in custody of the State Department. *See* 22 U.S.C. § 4308(f). But the Foreign Missions Act does not apply to property subject to TRIA. *See* TRIA § 201(a) (providing a mechanism for the attachment of various assets "[n]otwithstanding any other provision of law"); *cf. Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010) (concluding that TRIA's use of the phrase "notwithstanding any other provision of law" demonstrates a clear intent to abrogate previous, conflicting law). Thus, section 201(d)(2)(B)(ii) is not duplicative, but creates a protection from attachment that would not otherwise exist.

Finally, we note that it may very well be that the private parties who rented the properties did so in service of nondiplomatic ends. But their purposes are irrelevant to the protection Congress provided for these properties. TRIA says

nothing about the purpose anyone other than the United States might have in its use of the properties. "Blocked assets" are assets "seized or frozen *by the United States*." TRIA § 201(d)(2)(A) (emphasis added). Because TRIA's provisions apply only to property possessed by the United States, we think the statute clearly commands that the purpose of the United States is the only relevant inquiry.

Our concurring colleague finds the statute ambiguous on this point, and concludes that the use to which a private tenant puts a former diplomatic property may render it subject to attachment under TRIA. Concurring Op. at 2-3. But if there were such ambiguity, we would still conclude that attachment is precluded in light of the fundamental canon of statutory interpretation that "[a] treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." *Cook v. United States*, 288 U.S. 102, 120 (1933); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 237 (D.C. Cir. 2003). Congress, in defining the terrorist state property available for attachment, explicitly carved out an exception to enable the United States to fulfill its treaty obligations under the Vienna Convention. TRIA § 201(d)(2)(B)(ii). In this case, permitting attachment would render the United States unable to respect and protect Iran's former diplomatic properties as required by Article 45 of the Vienna Convention. We do not think Congress intended to construct such obstacles to the performance of the nation's obligations under the Vienna Convention.

Because there is no question that the sole purpose for which the United States rented the properties was to facilitate compliance with its treaty obligations under the Vienna Convention, the properties are not subject to attachment under TRIA. As the Fifth Circuit has explained, "by using rental

proceeds to carry out routine maintenance, the government 'respect[s] and protect[s]' the property presumably for the time when the two countries might resume diplomatic and consular relations." *Hegna v. Islamic Republic of Iran*, 376 F.3d 485, 495 (5th Cir. 2004). Collecting rent on a property in order to ensure the upkeep required by the Vienna Convention does not permit its attachment under TRIA.

## III.

The judgment is

*Affirmed.*

GARLAND, *Circuit Judge*, concurring in the judgment: The Terrorism Risk Insurance Act (TRIA) authorizes the attachment of "blocked assets" of state sponsors of terrorism to satisfy judgments won by victims of terrorist acts. TRIA § 201(a). Section 201(d) of TRIA provides that attachable blocked assets do not include former diplomatic property that "is being used exclusively for diplomatic or consular purposes." *Id.* § 201(d)(2)(B)(ii). I agree with my colleagues that property the State Department leases to another foreign mission is immune from attachment because it is property that is being used exclusively for diplomatic purposes. But I cannot agree that property the Department leases to a private party -- which that party then uses for its own private purposes -- is property that is being used *exclusively* for diplomatic purposes.

I concede that congressional drafting has not made our task easy. The difficulty arises because the section is written in the passive voice -- referring to property that "is being used exclusively" -- which leaves unanswered the question: being used *by whom*? My colleagues conclude that the section refers solely to use by the United States. They therefore hold that the tenant's use of the property is irrelevant as long as the State Department's only purpose in renting it is to generate revenue to comply with its Vienna Convention obligations.

This reading is reasonable, but I do not think it is the better interpretation. No one would say that property a tenant uses as a gin joint is being used exclusively for educational purposes, even if the landlord uses the rent to send his children to college. Nor is the court's reading supported by the fact that TRIA applies only to property "seized or frozen *by the United States*." TRIA § 201(d)(2)(A) (emphasis added). The italicized phrase tells us which actor's seizure is relevant, but it does not tell us which actor's use is. Indeed, the fact that Congress added "by the United States" to the description of the seizure of property in § 201(d)(2)(A), but not to the description of the use of property in § 201(d)(2)(B), suggests it thought that the uses to

which both the United States and its tenant put a property were relevant.

This inference is further supported by the waiver provision of TRIA, which authorizes the President to prevent the attachment of blocked assets on a case-by-case basis, unless the property "has been used *by the United States* for any nondiplomatic purpose." *Id.* § 201(b)(2)(A) (emphasis added). As is clear from that provision, Congress plainly knew how to specify use by the United States when that was the use it regarded as relevant. And "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted).

A final problem with the court's reading is that it reduces Congress' purpose to one of financial accounting, rather than to making assets available for the victims of terrorist attacks. That is the necessary consequence of focusing on how the United States uses the rent, rather than on how the tenant uses the property. In the court's view, rental property remains immune as long as the State Department applies the rent to maintenance expenses, but it becomes available for attachment if the Department returns the rent to the Treasury and uses appropriated funds to pay for maintenance. Even if Congress were concerned about how the Department keeps its books, it is hard to see why it would address this concern in a section entitled, "Satisfaction of Judgments from Blocked Assets of Terrorists." TRIA § 201.

For these reasons, I conclude that former diplomatic property that a private tenant uses for nondiplomatic purposes is not immune from attachment under TRIA § 201(d) as property

that "is being used exclusively for diplomatic or consular purposes." *Id.* § 201(d)(2)(B)(ii).

But this conclusion does not end the analysis. The remaining question is whether the property at issue here "is being" used exclusively for diplomatic purposes. Although it is clear that some of the properties *have been* rented to private tenants and *have been* used by those tenants for nondiplomatic purposes, there is no record evidence that any property *is being* used for such purposes. The difference in tense is dispositive.

In protecting from attachment property that "*is being* used exclusively for diplomatic or consular purposes," Congress expressly employed the present tense. TRIA § 201(d)(2)(B)(ii) (emphasis added). Where "Congress could have phrased its requirement in language that looked to the past . . . but . . . did not choose this readily available option," the "most natural reading" is to construe the statute in the present (or present and future) tense. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc.*, 484 U.S. 49, 57 (1987); *see Carr v. United States*, 130 S. Ct. 2229, 2236 (2010) ("By implication, . . . the Dictionary Act instructs that the present tense generally does not include the past." (referring to 1 U.S.C. § 1)). The inference that Congress' choice of tense was intentional is even stronger where, as here, the legislature employed the present tense in one subsection and the past tense in another. *Compare* TRIA § 201(d)(2)(B)(ii) (excepting from attachment all specified property that "*is being* used exclusively for diplomatic . . . purposes" (emphasis added)), *with id.* § 201(b)(2)(A) (authorizing the President to waive attachment on a case-by-case basis unless the property "*has been used* by the United States for any nondiplomatic purpose" (emphasis added)).

Given the statute's use of the present tense, I would hold that TRIA § 201(d)'s protection against attachment applies to property that "is being used exclusively for diplomatic or consular purposes" at the time the writ of attachment is filed, regardless of how the property was previously used. This construction follows the course set by the Supreme Court in interpreting analogous statutory language. In *Dole Food Co. v. Patrickson*, for example, the Court construed the Foreign Sovereign Immunities Act, which requires an entity seeking to remove a lawsuit to federal court to show that "a majority of [its] shares . . . *is owned* by a foreign state." 538 U.S. 468, 473 (2003) (emphasis added) (quoting 28 U.S.C. § 1603(b)(2)). The Court held that "the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined *at the time suit is filed*." *Id.* at 478 (emphasis added). Similarly, in *Gwaltney v. Chesapeake Bay Foundation*, the Court determined that the Clean Water Act's authorization of citizen suits against defendants "alleged to *be in violation*" of permit conditions "does not permit citizens suits for wholly past violations." 484 U.S. at 64 (emphasis added). Rather, it requires that the defendant be alleged to "'be in violation' . . . *at the commencement of suit*." *Id.* (emphasis added) (quoting 33 U.S.C. § 1365(a)(1)).

In this case, the requirement that the property "is being used exclusively for diplomatic or consular purposes" is satisfied by the district court's indication that, at the time the writs were issued, all of the properties were vacant and being held by the United States pursuant to its obligations under the Vienna Convention. *See Bennett v. Islamic Republic of Iran*, No. 03-1486, Mem. Op. at 21 (D.D.C. Mar. 31, 2009). Accordingly, I concur in my colleagues' decision to affirm the quashing of the writs.

I note, however, that if the United States again rents these properties to private tenants who use them for nondiplomatic purposes, the plaintiffs should be free to attach them to satisfy their judgments. Although the government fears that permitting attachment under any circumstances "could have significant implications for U.S. foreign policy," Appellee's Br. 16, and my colleagues warn that attachment could interfere with the United States' ability to fulfill its treaty obligations, the government can eliminate these concerns by ensuring that the properties are used exclusively for diplomatic purposes. If diplomatic tenants are unavailable, this may require the State Department to pay for maintenance from appropriated funds rather than rental income. But that presents at worst an economic, not a foreign policy problem. It is certainly a constraint that Congress is free to impose on the Department.