# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2024      Decided September 26, 2025

No. 23-7080

ESTATE OF JEREMY ISADORE LEVIN, ET AL.,
APPELLEES

JAMES OWENS, ET AL.,
APPELLANTS

v.

WELLS FARGO BANK, N.A. AND UNITED STATES OF AMERICA,
APPELLEES

———

Consolidated with 23-7082

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-00128)

———

*Suzelle M. Smith* argued the cause and filed the briefs for appellants Estate of Jeremy Isadore Levin, et al.

*Jessica L. Wagner* argued the cause for appellants James Owens, et al. With her on the briefs was *Matthew D. McGill*. *Jonathan C. Bond* entered an appearance.

*Brian P. Hudak*, Assistant U.S. Attorney, argued the cause for appellee United States of America. With him on the brief was *Matthew M. Graves*, U.S. Attorney. *Jane M. Lyons*, Assistant U.S. Attorney, entered an appearance.

*Alex C. Lakatos* argued the cause for appellee Wells Fargo Bank, N.A. With him on the brief was *Jennifer L. Weinberg*. *William D. Sinnott* entered an appearance.

*Christopher D. Man* was on the brief for *amicus curiae* Crystal Holdings Limited in support of neither party.

Before: KATSAS, WALKER, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: An instrumentality of the Islamic Republic of Iran wired nearly $10 million through an American bank. The United States blocked the funds pursuant to the International Emergency Economic Powers Act and then initiated a civil-forfeiture action against them. Plaintiffs, who hold judgments against Iran for supporting terrorism, later sought to attach those same funds in order to execute their judgments. The district court quashed the attachments on two independent grounds: First, the funds were immune from attachment because the Terrorism Risk Insurance Act, which permits execution against certain blocked assets of designated state sponsors of terrorism, did not apply. Second, the government's forfeiture action barred any later *in rem* proceeding against the same funds. We disagree on both points, so we reverse.

3

I

A

The Foreign Sovereign Immunities Act (FSIA) provides that foreign states are "immune from the jurisdiction" of United States courts unless one of its exceptions applies. 28 U.S.C. § 1604. One of these is the terrorism exception—courts may enter damages judgments against foreign states that have been designated as state sponsors of terrorism for committing or supporting specified terrorist activities. *Id.* § 1605A(a)(1); *see Bank Markazi v. Peterson*, 578 U.S. 212, 216 (2016).

The FSIA also provides the property of foreign states with immunities from attachment or execution. 28 U.S.C. § 1609. And it sets forth exceptions to these immunities. *Id.* § 1610.

B

Congress has authorized the President to regulate property owned by foreign governments or individuals in the interest of national security. Section 5(b) of the Trading with the Enemy Act (TWEA) authorizes the President to regulate "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 4305(b)(1)(B), but it applies only during wartime, *id.* § 4305(b)(1). Section 203 of the International Emergency Economic Powers Act (IEEPA), which contains no such limitation, is thus more prominent today. It enables the President to regulate transactions in property owned by "any foreign country or a national thereof," *id.* § 1702(a)(1)(B), in order to address "any unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat," *id.* § 1701(a). The President has declared a national emergency relating to foreign terrorism and, pursuant to section 203, has "blocked" the property of

persons designated as terrorists or supporters of terrorism. *See* Exec. Order No. 13,224, 66 Fed. Reg. 49,079, 49,079–80 (Sep. 23, 2001). The Office of Foreign Assets Control (OFAC) is charged with implementing this directive. It has provided that when property of designated persons comes "within the United States" or "the possession or control of U.S. persons," it is "blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. § 594.201(a). However, OFAC may remove or qualify a block by issuing a license for specified uses or transactions. *See id.*

C

Congress has made assets blocked under TWEA or IEEPA available to victims of state-sponsored terrorism. First, it amended the FSIA to provide that the holder of a terrorism-based judgment against a foreign sovereign may attach property for which transactions are "prohibited or regulated" under TWEA or IEEPA. 28 U.SC. § 1610(f)(1)(A). But Congress also authorized the President to waive section 1610(f) "in the interest of national security." *Id.* § 1610(f)(3). And the President did so almost immediately, finding that attachments under section 1610(f) would "impede the ability of the President to conduct foreign policy." *See* Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist-List States, 65 Fed. Reg. 66,483 (Oct. 28, 2000).

Congress overrode the waiver by including another attachment provision in the Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322 (TRIA). *See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Section 201 of TRIA states:

> Notwithstanding any other provision of law, … in every case in which a person has obtained a judgment

against a terrorist party on a claim based upon an act of terrorism, … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). In sum, a foreign sovereign's "blocked assets" are not immune from attachment by the holder of a terrorism-related judgment. TRIA defines a "blocked asset" as "any asset seized or frozen by the United States" under TWEA or IEEPA, *id.* § 201(d)(2)(A), but it excludes from the definition assets that are subject to certain licenses or used exclusively for diplomatic purposes, *id.* § 201(d)(2)(B). And it defines a "terrorist party" to include any foreign country designated as a state sponsor of terrorism. *Id.* § 201(d)(4). Where it applies, TRIA thus operates to abrogate the FSIA's general immunity from execution and attachment that would otherwise protect the property of designated state sponsors of terrorism. Iran was so designated in 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836 (Jan. 23, 1984).

D

Plaintiffs with terrorism-related judgments against foreign sovereigns also may seek compensation from the United States Victims of State Sponsored Terrorism Fund. *See* 34 U.S.C. § 20144(e)(1). Such plaintiffs may apply to the Victims Fund for compensation. *See id.* § 20144(c)(3)(A). The Fund then makes distributions to each eligible applicant on a pro rata basis up to a statutory cap. *Id.* § 20144(d)(3)(A)(i)–(ii).

Congress initially funded the Victims Fund with an appropriation. 34 U.S.C. § 20144(e)(5). But the Fund is now financed primarily by proceeds from enforcement actions under TWEA and IEEPA—including forfeiture actions against blocked assets. *See id.* § 20144(e)(2)(A)(i)–(ii).

## II

This appeal involves two groups of plaintiffs holding terrorism-related judgments against Iran—the Owens and Levin plaintiffs. The Owens plaintiffs are owed almost a billion dollars on judgments arising from Al Qaeda's 1998 bombings of United States embassies in Kenya and Tanzania. The Levin plaintiffs are owed approximately $15 million on a judgment arising from the 1984 kidnapping and torture of Jeremy Levin by the Iran-backed terrorist group Hezbollah.

Both groups seek to attach the same $9.98 million—which we call the "Funds"—to help execute their judgments. That money surfaced after Taif Mining Services tried to wire it to another foreign entity through Wells Fargo in New York. Taif was prohibited from doing so because it is a front company for the Iranian Revolutionary Guard Corps—an instrumentality of Iran and OFAC-designated sponsor of terrorism. *See* 31 C.F.R. § 594.201(a)(5); *Est. of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416, 417 (D.C. Cir. 2022) (*Levin I*). Alerted by OFAC, Wells Fargo halted the transfer of the Funds and placed the Funds in a South Dakota account. OFAC then issued an order memorializing that the Funds were blocked under section 203 of IEEPA, Executive Order 13,224, and 31 C.F.R. § 594.201.

After it blocked the Funds, the government moved to confiscate them by civil forfeiture. It filed an action against them in our district court, and the case was assigned to Chief Judge Boasberg. The government then sought a license from OFAC "for the purpose of perfecting civil *in rem* forfeiture of

the Blocked Funds pursuant to 18 U.S.C. § 981." J.A. 287. OFAC granted the request, authorizing the government "to engage in all transactions necessary and ordinarily incident to effect the forfeiture" of the Funds. *Id.* at 291. It also authorized Wells Fargo to relinquish custody of the Funds, but only to the government, and only if the government "furnish[ed] a valid forfeiture order." *Id.* Until then, OFAC's license did not permit Wells Fargo to do anything with the Funds.

While the government was taking steps toward forfeiture, a Wall Street Journal story brought the Funds to the attention of both plaintiff groups. *See* Sun & Tokar, *U.S. Charges Two Iranians Over Oil Tanker Purchase, Seeking $12 Million Forfeiture*, Wall St. J. (May 2, 2020), https://perma.cc/B75B-KMVT. Invoking TRIA, both groups moved for writs of attachment in the district court. In the *Owens* case, Judge Bates granted writs of attachment and then transferred the matter to Chief Judge Boasberg for coordination with the government's civil-forfeiture action. In the *Levin* case, Judge Moss transferred the matter to Chief Judge Boasberg, who granted the writs but allowed the government to move to quash.

The government moved to quash the Owens and Levin plaintiffs' writs, and the district court granted the motion. Initially, it concluded that Iran lacked any property interest in the funds held by Wells Fargo. *Levin v. Islamic Republic of Iran*, 523 F. Supp. 3d 14, 21 (D.D.C. 2021). Reversing, we held that terrorist victims may attach blocked assets traceable to a terrorist owner and that the funds were "traceable to Taif and thus to Iran." *Levin I*, 45 F.4th at 423 (cleaned up).

On remand, the district court again granted the motions to quash. In relevant part, it offered two justifications. First, sovereign immunity barred the attachments. On this point, the court concluded that TRIA's abrogation of immunity did not

apply because the Funds did not meet the statutory definition of "blocked assets." *Est. of Levin v. Wells Fargo Bank, N.A.*, No. 21-cv-420, 2023 WL 3750577, at *6 (D.D.C. June 1, 2023). Second, the court held that the government's civil-forfeiture action independently foreclosed relief because, under the prior exclusive jurisdiction doctrine, that first-filed case barred all subsequent actions against the same property. *Id.* at *9. In closing, the district court also remarked that Congress's decision to create the Victims Fund "cast heavy doubt" that it meant "to encourage a race to the courthouse by individual victims seeking to attach foreign funds that glance off the U.S. financial system." *Id.* at *12.

Both groups appealed. Our review is *de novo*. *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010).

## III

Section 201(a) of TRIA makes the "blocked assets" of a "terrorist party" available to satisfy terrorism-related judgments against foreign sovereigns designated as state sponsors of terrorism. *Levin I* held that the Funds here are sufficiently traceable to Iran as a "terrorist party." 45 F.4th at 423–24. We now hold that the Funds are also "blocked assets."

## A

Section 201(d)(2)(A) of TRIA defines a "blocked asset" as "any asset seized or frozen by the United States" under TWEA or IEEPA. The statute then excludes from this definition two categories of property. The first covers any property that is "subject to a license … for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than [IEEPA] or the United Nations Participation

Act" (Participation Act). *Id.* § 201(d)(2)(B)(i). The second exclusion covers property that is used for diplomatic purposes. *Id.* § 201(d)(2)(B)(ii).

The Funds meet all the elements of this statutory definition. They are "frozen" because the OFAC blocking order provides that they "may not be transferred, paid, exported, withdrawn, or otherwise dealt in without prior authorization from OFAC." J.A. 271. In other words, the Funds may do nothing but sit in a bank account. Moreover, OFAC imposed the freeze pursuant to IEEPA. The license exception does not apply because the license itself was required by IEEPA, not by a statute "other than" IEEPA or the Participation Act. And nobody contends that the exception for diplomatic property applies.

## B

The government responds that the Funds are not a "blocked asset" because they are not "frozen." We disagree.

## 1

The government contends that an asset is frozen only if it is fully immobilized. And it says that the Funds are not fully immobilized because OFAC has issued a license authorizing the government to seek their forfeiture.

This argument likely falters at its major premise. In both ordinary and legal parlance, an asset is frozen if it is difficult to convert into cash. *See Frozen asset*, Webster's New International Dictionary 915 (3d ed. 1961) ("an asset that cannot readily be turned into cash without heavy loss"); *Asset*, Black's Law Dictionary (12th ed. 2024) (defining "frozen asset" as "[a]n asset that is difficult to convert into cash because of court order or other legal process"). That suggests an asset

is frozen if it is subject to a significant restriction; the restriction need not be fully immobilizing.

In any event, the Funds *are* fully immobilized despite the forfeiture license. The license does just two things. First, it permits courts to enter orders in forfeiture proceedings respecting the Funds. *See* Forfeiture License §§ 1(a), 3(a)–(b), J.A. 291. Second, it permits Wells Fargo to relinquish custody of the Funds to the government *if* the government obtains a valid forfeiture order. *See id.* §§ 1(b), 2, J.A. 291. But the government has not yet obtained a forfeiture order, so for the time being, all dealing in the Funds is prohibited—they must remain in a Wells Fargo account. *See* 31 C.F.R. § 594.502(c) (a license removes a prohibition "only to the extent specifically stated by its terms"). In other words, the license does not unfreeze the Funds.

Arguing even more broadly, the government contends that *any* OFAC license authorizing *any* use unfreezes otherwise blocked funds. We see no textual support for that interpretation. For one thing, it runs headlong into the ordinary and legal meaning of *frozen asset*, as explained above. And it is implausible in light of TRIA's historical context. Congress enacted section 201 in response to the President's waiver of 28 U.S.C. § 1610(f). The whole point of section 201 was to eliminate the President's discretion to prevent victims of state-sponsored terrorism from attaching blocked assets. *See Elahi*, 556 U.S. at 386. If the government were right, then section 201 would not prevent the very mischief that Congress sought to address—that provision would allow the Executive to thwart attachment of blocked assets simply by authorizing itself to initiate forfeiture proceedings.

Structural considerations reinforce this conclusion. The license exception excludes from the definition of "blocked

asset" property that is subject to specific kinds of licenses required by specific statutory authorities. TRIA § 201(d)(2)(B)(i). That exception would be puzzling if the government were right that other kinds of licenses required by other statutory authorities could have the same practical effect by making the relevant asset no longer "frozen" or "blocked." In that instance, Congress would have had little reason to specify *which* licenses fall within the exception. *See Esteras v. United States*, 145 S. Ct. 2031, 2040–41 (2025) (negative-implication canon). Moreover, the exception would be even more puzzling if the government were right that *any* license operates to un-freeze and un-block assets for TRIA purposes. In that instance, the license exception—with all of its qualifications regarding the covered kinds of licenses and statutory authorities—would be surprisingly reduced to surplusage. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (canon against surplusage).

To defuse this concern, the government points out that OFAC has blocking and licensing authority under statutes besides TWEA and IEEPA, such as the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1904(b). The government contends that the license exception can therefore do meaningful work even if any TWEA or IEEPA license un-freezes and un-blocks the relevant asset. The government asks us to imagine an asset simultaneously blocked under IEEPA and the Kingpin Act. As the government explains, if the government licensed transactions under its Kingpin Act authority but not under its IEEPA authority, then TRIA's license exception would operate to un-block the asset for TRIA purposes. And so, the government concludes, the license exception does meaningful work even under its narrow reading of "blocked" and "frozen."

This account has several difficulties. To begin with, TRIA's text suggests that Congress envisioned OFAC would license specific transactions rather than remove statutory blocks one-by-one. Its license exception covers "property" subject to a license "for final payment, transfer, or disposition" in connection with a transaction that requires a license. TRIA § 201(d)(2)(A). If a license merely removed one of multiple overlapping statutory blocks on an asset, it would not actually authorize a transaction finally transferring or disposing of that property. Moreover, the government offers no explanation for why Congress would focus on the unblocking of assets in this piecemeal fashion. And the record before us suggests that OFAC keys licenses to particular *transactions*, without regard for the particular statute or statutes supporting the block. *See* Forfeiture License, § 1(a), J.A. 291 (licensing the government "to engage in [certain] transactions," without specifically mentioning IEEPA); *see also* J.A. 290 (granting the license "under the authority of one or more" statutes and regulatory provisions, without specifying which). Furthermore, regardless of whether the government's interpretation of "frozen" would reduce the license exception entirely to surplusage, or would simply render it implausibly narrow, that structural consideration cuts against its proposed interpretation. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988). And finally, the government's account at most responds to the structural argument that its interpretation of "frozen" makes the license requirement implausibly narrow. This does not undercut the frontline textual argument regarding the plain meaning of *frozen asset*.

For these reasons, we conclude that a highly restrictive license like the one at issue here does not make TRIA inapplicable. The Funds remain "frozen" and thus "blocked." And because the relevant license was not required under a

statute "other than" IEEPA or the Participation Act, the license exception does not apply.

2

The government also invokes precedent, primarily three circuit decisions. With respect, we find the cited authorities either inapposite or unpersuasive.

First, the government cites *Bank of New York v. Rubin*, 484 F.3d 149 (2d Cir. 2007), where the Second Circuit endorsed the reasoning in *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y. 2004). *See* 484 F.3d at 150. In *Weinstein*, a district court held that the relevant accounts were not "frozen" under TRIA because the OFAC orders at issue allowed the assets' owners to retrieve their funds under certain conditions. *See* 299 F. Supp. 2d at 73–74. *Weinstein* stands for the obvious proposition that not every IEEPA restriction freezes an asset. In particular, if OFAC allows the owner of an asset to withdraw it from the United States, the asset is easily converted into cash and thus not frozen. *See id.* at 74; Webster's, *supra*, at 915 (defining "frozen asset"). That point hardly supports the government's position that any license unfreezes an asset, no matter how restrictive.

The second case is *United States v. Holy Land Foundation for Relief & Development*, 722 F.3d 677 (5th Cir. 2013). *Holy Land* involved assets blocked by IEEPA and the criminal-forfeiture statute, 21 U.S.C. § 853(e)(1)(A), which allows the government to restrain assets pending criminal-forfeiture proceedings. *See* 722 F.3d at 681–82. The government sought and obtained an OFAC license to allow it to pursue the forfeiture. *Id.* at 682. The plaintiffs held terrorism-related judgments against the owners of the blocked funds, and they invoked TRIA to attach the assets. *Id.* The district court issued a writ of attachment, but the Fifth Circuit reversed. Without

textual analysis or citations to precedent, the Fifth Circuit stated that TRIA does not "reach those funds which the government has been given authorization to control through another means" such as the criminal-forfeiture statute. *Id.* at 685. But an asset may be "frozen" and thus "blocked" under IEEPA even if some other statute allows particular uses or transactions for the funds. And although section 853 authorizes both asset blocks and criminal-forfeiture proceedings against the blocked assets, it does not displace the IEEPA block. To do that, the government in *Holy Land* needed to obtain an IEEPA license. *See id.* at 687. Moreover, even after the license issued, the IEEPA block still prevented all dealing in the funds unless and until a court entered a final forfeiture order. *See id.* (noting that the license allowed the forfeiture process to proceed "[n]otwithstanding the status of [the] assets as blocked"). That means the funds were still "frozen" and thus "blocked" within the meaning of TRIA. And because the license obtained was not "required by a statute other than" IEEPA, the license exception did not apply. *See* TRIA § 201(d)(2)(B)(i).

The government's final case is *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607 (7th Cir. 2015). There, the Seventh Circuit held that plaintiffs could not use TRIA to attach IEEPA-blocked funds because OFAC had licensed the government to pursue civil forfeiture against them. The court relied primarily on TRIA's license exception. It reasoned that because the funds at issue were subject to a civil-forfeiture license, which is "a license for final transfer or disposition," the license exception carved them out from TRIA's definition of "blocked assets." *Id.* at 624. But again, the license exception by its terms applies only if assets are subject to a license "required by a statute other than" IEEPA or the Participation Act. *See* TRIA § 201(d)(2)(B)(i). As Judge Manion explained, only IEEPA required the government to

seek the license in question, so the license did not unblock the frozen assets. *See R.J. O'Brien*, 783 F.3d at 630 (Manion, J., dissenting in relevant part).

\* \* \* \*

Because the Funds fall within TRIA's definition of a "blocked asset," section 201 of TRIA applies and abrogates what would otherwise be Iran's sovereign immunity from attachment in aid of execution of the plaintiffs' judgments.

IV

The district court further held that the prior exclusive jurisdiction doctrine independently bars attachment of the Funds. That doctrine seeks to prevent multiple *in rem* proceedings against the same property at the same time. We hold that the doctrine does not apply to proceedings, like the competing forfeiture and attachment matters here, filed in the same court.

The prior exclusive jurisdiction doctrine is an "ancient and oft-repeated rule" of *in rem* and *quasi in rem* jurisdiction. 16 C. Wright & A. Miller, Federal Practice and Procedure § 3631 (3d ed. 2025). It provides that "when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court." *Id.* So when two *in rem* actions are filed against the same property in different courts, only one "court, or its officer" may possess or control "the property which is the subject of the litigation." *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). Thus "the jurisdiction of the one court must yield to that of the other." *Id.* In sum, only one court at a time may exercise jurisdiction over particular property.

16

On that understanding, the prior exclusive jurisdiction doctrine does not apply here. This case involves three competing *in rem* actions filed against the same property—one civil-forfeiture action and two attachment proceedings under TRIA. But all three were filed in the same court—the District Court for the District of Columbia. The cases thus present no problem of multiple courts simultaneously exercising jurisdiction over the same property.

The government objects that the prior exclusive jurisdiction doctrine does more than simply prevent jurisdictional conflicts between courts. It contends that once a suit involving particular property is filed, the doctrine bars any other suit involving the same property. The government thus seeks to apply the doctrine to competing lawsuits filed before different judges, even if they all serve on the same court. The government is mistaken.

A

The prior exclusive jurisdiction doctrine is "based upon necessity." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 235 (1922). So it does not apply "where the necessity, actual or potential, does not exist." *Id.* Thus, the scope of the doctrine turns on what problem it exists to solve.

Here is the problem: A court cannot proceed in a suit involving particular property without seizing the property. *See, e.g.*, *Republic Nat'l Bank of Mia. v. United States*, 506 U.S. 80, 84 (1992) ("It long has been understood that a valid seizure of the *res* is a prerequisite to the initiation of an *in rem* … proceeding." (cleaned up)). So one court hearing an *in rem* action must seize the property against which it is directed. And a second court could not hear an *in rem* action against the same property without seizing it from the first, which would create "unseemly conflicts between courts whose jurisdiction

embraces the same subject." *Kline*, 260 U.S. at 231; *see Penn Gen. Cas. Co. v. Commonwealth of Pa. ex rel. Schnader*, 294 U.S. 189, 195 (1935). No such conflicts arise when multiple suits are filed in the *same* court. In that instance, the court takes control of the property by virtue of the first-filed suit. And later suits merely ask the court to consider further claims against it.

The Supreme Court suggested as much in *Hagan v. Lucas*, 35 U.S. (10 Pet.) 400 (1836). That case arose after a federal court directed a marshal to seize property that a sheriff had levied pursuant to a state court order. *Id.* at 401. The Supreme Court deemed the federal seizure order invalid. It reasoned that the prior exclusive jurisdiction doctrine prevents a court from attaching property already seized by a different court. *Id.* at 403. It explained that "[t]he first levy, whether it were made under the federal or state authority, withdraws the property from the reach of the process of the other." *Id.* At the same time, however, the Court also observed that the first levy does *not* withdraw the property from the reach of the process of the same court. *Id.* For even after a sheriff seizes property pursuant to a writ of attachment, a judge or sheriff in the same "jurisdiction" may issue additional writs of attachment or execution against that property. *Id.* In other words, the prior exclusive jurisdiction doctrine does not prevent a single court from presiding over multiple suits involving the same property.

B

The government argues that the prior exclusive jurisdiction doctrine exists to prevent not only jurisdictional conflicts arising when cases are filed, but also inconsistent judgments when they are adjudicated. The government reasons that district judges within a single court are not bound by each other's rulings, just as district judges on different courts do not bind one another. So, it concludes, the prior exclusive

jurisdiction doctrine must foreclose multiple *in rem* proceedings even within the same court.

The government's view has little to recommend it. For one thing, we have found no case applying the doctrine in this way; the cases cited by the government involve actual or potential conflicts between state and federal courts. *See United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 478 (1936); *Hammer v. HHS*, 905 F.3d 517, 536 (7th Cir. 2018). Moreover, rules of claim and issue preclusion prevent conflicting judgments. *See* Restatement (Second) of Judgments § 30 (1982). And the concern that there would be unseemly competition between judges of the same court strikes us as unrealistic. In the main, local rules will funnel cases involving the same property to the same district judge. Here, for example, Judge Bates and Judge Moss invoked D.D.C. Local Rule 40.5 to transfer their respective TRIA attachment cases to Chief Judge Boasberg, who was already presiding over the government's first-filed forfeiture action. And with all three cases before a single judge, there is no need to allow only the first-filed case to be considered.[1]

---

[1] The government hints at an argument that the civil-forfeiture statute bars the attachment proceedings here. In relevant part, that statute provides that property "taken or detained [by civil forfeiture] shall not be repleviable, but shall be deemed to be in the custody of the [government], subject only to the orders and decrees of the court or the official having jurisdiction thereof." 18 U.S.C. § 981(c). The government notes that section 981(c) ordinarily bars plaintiffs from initiating process against property already subject to a civil-forfeiture proceeding. But the government does not argue that section 981(c) bars attachments specifically authorized by TRIA. For good reason, because TRIA's attachment provision applies "[n]otwithstanding any other provision of law." TRIA § 201(a). We have said that this phrase "clearly requires courts to disregard other statutory provisions that conflict with the scope of the TRIA." *Greenbaum v. Islamic*

19

V

Only one argument remains—that our holding might disrupt the Victims Fund.  As explained above, the Fund is now financed largely through forfeiture actions pursued by the United States against the blocked assets of terrorist parties.  So, when a judgment holder invokes TRIA to recover assets that would otherwise be forfeited, he takes funds that would otherwise be distributed more broadly and more equitably to similarly situated holders of terrorism-related judgments.

We appreciate the force of this argument as a policy matter.  Nevertheless, Congress did not expressly modify TRIA when it created the Victims Fund, and we may not assume that it did so impliedly.  *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 799 (D.C. Cir. 2023) (noting the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute" (cleaned up)).  Moreover, in creating the Victims Fund, Congress expressly provided that plaintiffs whose judgments are not fully satisfied by distributions from the Fund retain the right to satisfy their judgments through other mechanisms— which presumably would include TRIA collection actions.  *See* 34 U.S.C. § 20144(d)(5)(B).  In sum, any anomaly in the interaction between the Victims Fund and TRIA is a problem for Congress, not the judiciary.

---

*Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023).  So, if TRIA specifically allows attachments that the civil-forfeiture statute specifically prohibits, TRIA prevails.

20

## VI

Neither sovereign immunity nor the prior exclusive jurisdiction doctrine barred the attachment proceedings pursued by the Owens and Levin plaintiffs. We reverse the order quashing these plaintiffs' writs of attachment.

*So ordered.*